Gregory Stamatopoulos
Paul F. Novak
WEITZ & LUXENBERG PC
3011 W Grand Blvd, 24th Floor
Detroit, MI 48202
Telephone: (313) 800-4170

Ellen Relkin
WEITZ & LUXENBERG PC
220 Lake Dr E #210
Cherry Hill, NJ 08002
Telephone: (856) 755-1115

Mark Bernstein
Matthew Aneese
THE SAM BERNSTEIN LAW FIRM PLLC
31731 Northwestern Hwy, Suite 333
Farmington Hills, MI 48334
Telephone: (888) 225-5726

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| COUNTY OF MACOMB, MICHIGAN, | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ELI LILLY AND COMPANY, SANOFI-AVENTIS U.S. LLC, NOVO NORDISK INC., CVS HEALTH CORPORATION, CVS PHARMACY, INC., CAREMARK RX, LLC, CAREMARK LLC, CAREMARKPCS HEALTH, LLC, EVERNORTH HEALTH, INC., EXPRESS SCRIPTS, INC., EXPRESS SCRIPTS ADMINISTRATORS, LLC, MEDCO HEALTH SOLUTIONS, INC., ESI MAIL PHARMACY SERVICE, INC., EXPRESS SCRIPTS PHARMACY, INC., UNITEDHEALTH GROUP, INC., OPTUM, INC., OPTUMRX, INC., and OPTUMINSIGHT, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT and** <br> **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   PARTIES ...............................................................................................................3

    A.    Plaintiff ......................................................................................................3

    B.    The Manufacturer Defendants ..................................................................4

    C.    The PBM Defendants.................................................................................8

III.  JURISDICTION AND VENUE ..........................................................................34

IV.   ADDITIONAL FACTUAL ALLEGATIONS ....................................................36

    A.    The Stakeholders in the Insulin Market..................................................36

    B.    Diabetes and Insulin Therapy .................................................................37

    C.    Other Diabetes Treatments .....................................................................44

    D.    The Dramatic Rise in the Price of Diabetes Medications in the United States ......................................................................................................46

    E.    Manufacturers Increased Prices in Lockstep ..........................................50

    F.    The Pharmaceutical Payment and Supply Chain ....................................55

    G.    The PBMs' Role in the Pharmaceutical Payment Chain ........................56

        1.    The Rise of the PBMs in the Pharmaceutical Supply Chain ....................59

        2.    The Insular Nature of the Pharmaceutical Industry .................................60

    H.    The Illegal Pricing Scheme .....................................................................65

    I.    Defendants Play Down the Illegal Pricing Scheme and Its Harms.......................70

    J.    All Defendants Profit from the Illegal Pricing Scheme ..........................76

        1.    The PBMs Pocket a Substantial Share of Manufacturers' Secret Payments ............................................................................................78

        2.    The Illegal Pricing Scheme Allows the PBMs to Profit off Pharmacies ..........................................................................................85

        3.    The Illegal Pricing Scheme Increases PBM Mail-Order Profits................90

K.     Plaintiff Purchased or Reimbursed for At-Issue Drugs from Defendants ............91

L.     Defendants Deceived Plaintiff .................................................................92

     1.     The Manufacturer Defendants Deceived Plaintiff ....................................92

     2.     The PBM Defendants Deceived Plaintiff ..................................95

M.     The Illegal Pricing Scheme Has Damaged Plaintiff ............................107

N.     Defendants' Recent Efforts in Response to Rising Insulin Prices ......................108

V.     TOLLING OF THE STATUTE OF LIMITATIONS ...................................................110

A.     Discovery Rule.................................................................110

B.     Fraudulent Concealment ...............................................112

C.     Equitable Estoppel .........................................................112

D.     Continuing Violations ...................................................113

VI.     CLAIMS FOR RELIEF .................................................................113

COUNT I ....................................................................................113

Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c) ..........................................................................113

A.     Defendants Are Culpable "Persons" Under RICO .............................113

B.     The Manufacturer-PBM RICO Enterprises .........................................114

C.     The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the Illegal Pricing Scheme..........................................117

     1.     Defendants' Use of the United States Mails and Interstate Wire Facilities..........................................................119

D.     Conduct of the Manufacturer-PBM Enterprises' Affairs....................121

E.     Defendants' Pattern of Racketeering Activity ...................................123

F.     The RICO Defendants' Motive.........................................124

**Page**

G.    The Manufacturer-PBM Enterprises' Illegal Pricing Scheme Injured
Plaintiff ..................................................................................................................125

COUNT II .............................................................................................................................127

Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.
§1962(d), by Conspiring to Violate 18 U.S.C. §1962(c) .....................................127

COUNT III ...........................................................................................................................128

Contract, Combination, and Conspiracy in Restraint of Trade in Violation of
Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1 ...........................128

COUNT IV ...........................................................................................................................134

Violations of the Michigan Antitrust Reform Act, Mich. Comp. Laws §445.772 ..........134

COUNT V .............................................................................................................................135

Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws
§445.901, *et seq.* ..................................................................................................135

COUNT VI ...........................................................................................................................136

Unjust Enrichment ...........................................................................................................136

VII.    PRAYER FOR RELIEF ...........................................................................................138

VIII.    JURY DEMAND .......................................................................................................139

Plaintiff County of Macomb, Michigan ("County of Macomb" or "Plaintiff"), by and through the undersigned counsel, brings this action against Eli Lilly and Company, Sanofi-Aventis U.S. LLC, Novo Nordisk Inc., CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark LLC, CaremarkPCS Health, LLC, Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., UnitedHealth Group, Inc., Optum, Inc., OptumRx, Inc., and OptumInsight, Inc., and in support thereof, alleges as follows:

## I.    INTRODUCTION

1.    This action is filed by Macomb County, Michigan, in a proprietary capacity, to recover damages associated with the excessive costs the County has paid for insulin used by County employees, retirees and their dependents, and in other County programs. The lawsuit also seeks injunctive and other equitable relief to suspend the price gouging conduct that has caused insulin prices to explode in the United States to the detriment of the public.

2.    When the process for extraction and purification of insulin was first discovered in 1921, the inventors reluctantly patented their discovery and assigned it to the University of Toronto for a token payment of $1.00 so that "anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[1]

3.    These steps were hailed as "a step forward in medical ethics," and for decades resulted in the sharing of improvements and affordable prices to those who needed this life-saving medication.

---

[1]    Jessica DiGiacinto & Valencia Higuera, *Everything You Need to Know About Insulin*, Healthline (Apr. 20, 2023), http://www.healthline.com/health/type-2-diabetes/insulin; Michael Bliss, *The Discovery of Insulin* (2013).

4.      However, in the recent decades that would follow, innovation has stalled and prices have skyrocketed, in some instances over 1500%, far outpacing normal consumer goods and services.  This case is about the illegal scheme between Defendants to artificially inflate the price of these life-saving medications so that they can achieve supracompetitive pricing and profits, herein referred to as the "Illegal Pricing Scheme."

5.      This case is also about the victims of Defendants' Illegal Pricing Scheme, those who have no choice but to pay Defendants' ransom to maintain access to their medications.

6.      The Illegal Pricing Scheme can be summarized as follows: the Pharmacy Benefit Manager ("PBM") Defendants (defined below) demand large, secret, and ever-growing "rebates" and other payments from the Manufacturer Defendants (defined below) (collectively, with the PBM Defendants, "Defendants").  In exchange, the PBM Defendants place the Manufacturer Defendants' insulin medications on their preferred formularies, giving them a competitive advantage over other insulin medications, and significantly increasing sales.  In order to sustain this, the Manufacturer Defendants collusively and illegally increase their insulin prices in near-lockstep, passing these costs on to the public.

7.      This Illegal Pricing Scheme works because the PBM Defendants control approximately 89% of the PBM market, and the Manufacturer Defendants control approximately 99% of the insulin market by value, and 96% by volume.  With oligopolistic market power, each Defendant is able to engage in the above described collusive and anti-competitive pricing behavior.

8.      Plaintiff brings this action against the PBM Defendants and the Manufacturer Defendants to put a stop to this Illegal Pricing Scheme, and to recover Defendants' ill-gotten gains, all of which were derived at Plaintiff's expense.

II.     **PARTIES**

    A.     **Plaintiff**

9.     Plaintiff County of Macomb, Michigan is a county located in the State of Michigan and is one of the most populous counties in Michigan. County of Macomb is authorized to bring this action and recover costs under Mich. Comp. Laws §45.3.

10.     As a governmental entity, Plaintiff provides vital services to its approximately 875,000 citizens, including public safety, emergency management, and health services.

11.     Any increase in spending has a detrimental effect on Plaintiff's overall budget and, in turn, negatively impacts its ability to provide necessary services to its constituents.

12.     The Illegal Pricing Scheme has had such an effect.

13.     As a government employer, Plaintiff provides health benefits to its employees, retirees, and their dependents ("Beneficiaries").   One of the benefits Plaintiff offers its Beneficiaries is paying a substantial share of the purchase price of their pharmaceutical drugs, including the at-issue diabetes medications.

14.     Plaintiff maintains self-insured health plans for its Beneficiaries.

15.     Plaintiff also purchases the at-issue diabetes medications for use in county-run facilities.

16.     As far back as 2011, diabetes treatment was one of Plaintiff's costliest diseases as measured by the ingredient costs for medications, *i.e.*, the cost of drugs less the dispensing fee. Each year, Plaintiff has paid hundreds of thousands of dollars for insulin products.

17.     Over the course of the relevant period – as prices continued to rise – Plaintiff spent significant amounts of public monies in overcharges to the exclusion of other necessary expenditures, and to the detriment of its Beneficiaries and the public.

- 3 -

18.      Defendants Express Scripts (defined below) and OptumRx (defined below) provided PBM services to Plaintiff.

19.      Plaintiff seeks relief for the harm suffered by Defendants' misrepresentations, omissions, and anticompetitive behavior regarding their Illegal Pricing Scheme.

### B.      The Manufacturer Defendants

**Eli Lilly and Company**

20.      Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.  It is a citizen of the State of Indiana.

21.      In Michigan and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue diabetes medications: Humulin N (first U.S. approval in 1982), Humulin R (first U.S. approval in 1982), Humalog (first U.S. approval in 1996), Trulicity (first U.S. approval in 2014), and Basaglar (first U.S. approval in 2015).

22.      Eli Lilly's domestic revenues from 2019 to 2021 were $11.9 billion from Trulicity, $4.48 billion from Humalog, $2.58 billion from Humulin, and $2.31 billion from Basaglar.[2]

23.      Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.[3]

24.      Eli Lilly transacts business in Michigan, including in County of Macomb, targeting these markets for its products, including the at-issue diabetes medications.

25.      Eli Lilly employs sales representatives throughout Michigan to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar and it utilizes wholesalers to distribute

---

[2]      Eli Lilly & Co., Annual Report (Form 10-K) (Feb. 23, 2022).

[3]      Eli Lilly & Co., Annual Report (Form 10-K) (Feb. 19, 2019).

the at-issue products to pharmacies and healthcare professionals within Michigan, including in County of Macomb.

26.     Eli Lilly also directs advertising and informational materials to physicians within Michigan and County of Macomb and potential users of Eli Lilly's products.

27.     At all relevant times, in furtherance of the Illegal Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout Michigan with the express knowledge that payment and reimbursement by Plaintiff would be based on those false list prices.

28.     During the relevant period, Plaintiff purchased or reimbursed Eli Lilly's at-issue drugs at prices based on false list prices generated by the Illegal Pricing Scheme through its employee health plans.

29.     All of the Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Michigan based on the specific false and inflated prices Eli Lilly caused to be published in County of Macomb in furtherance of the Illegal Pricing Scheme.

**Sanofi-Aventis U.S. LLC**

30.     Defendant Sanofi-Aventis U.S. LLC ("Sanofi") is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.  It is a citizen of the State of Delaware and the State of New Jersey.

31.     Sanofi manufactures, promotes, and distributes pharmaceutical drugs both in Michigan and nationally, including several at-issue diabetes medications: Lantus (first U.S. approval in 2000), Apidra (first U.S. approval in April 2004), Toujeo (first U.S. marketing authorization in February 2015), and Soliqua (first U.S. approval in November 2016).

32.     Sanofi considers Lantus one of its "flagship products" and "one of Sanofi's leading products in 2021 with net sales of €2,494 million" ($2.95 billion), and net sales of €2,661 million ($3.04 billion) in 2020, representing 7.4% of the company's net sales for 2020.[4]

33.     Sanofi's U.S. net sales in 2019 were $1.29 billion from Lantus, $323.7 million from Toujeo, and $51.5 million from Apidra.[5]

34.     Sanofi transacts business in Michigan and in County of Macomb, targeting these markets for its products, including the at-issue diabetes medications.

35.     Sanofi employs sales representatives throughout Michigan and in this District to promote and sell Lantus, Toujeo, Apidra, and Soliqua, and it utilizes wholesalers to distribute the at-issue products to pharmacies and healthcare professionals within Michigan, including in County of Macomb.

36.     Sanofi also directs advertising and informational materials to physicians within Michigan and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in Michigan and County of Macomb and profiting from the Illegal Pricing Scheme.

37.     At all relevant times, in furtherance of the Illegal Pricing Scheme, Sanofi published its prices of its at-issue diabetes medications throughout Michigan for the purpose of payment and reimbursement by payors, including Plaintiff.

38.     During the relevant period, Plaintiff purchased or reimbursed Sanofi's at-issue drugs at prices based on false list prices generated by the Illegal Pricing Scheme through its employee health plans.

---

[4]   Sanofi, Annual Report (Form 20-F) (Feb. 23, 2022); Sanofi, Annual Report (Form 20-F) (Mar. 4, 2021).

[5]   Sanofi, Annual Report (Form 20-F) (Mar. 5, 2020).

39.     All of the Sanofi diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Michigan and County of Macomb based on the specific false and inflated prices Sanofi caused to be published in Michigan in furtherance of the Illegal Pricing Scheme.

**Novo Nordisk Inc.**

40.     Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  It is a citizen of the State of Delaware and the State of New Jersey.

41.     Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs both in Michigan and nationally, including at-issue diabetic medications: Novolin R (first U.S. approval in 1991), Novolin N (first U.S. approval in 1991), Novolog (first U.S. approval in June 2002), Levemir (first U.S. approval in June 2005), Victoza (first U.S. approval in January 2010), Tresiba (first U.S. approval in 2015), and Ozempic (first U.S. approval in 2017).

42.     Novo Nordisk's combined net sales of these drugs in the United States from 2018 to 2020 totaled approximately $18.1 billion ($6.11 billion for Victoza alone).[6]

43.     Novo Nordisk's global revenues for "total diabetes care" over the same three-year period exceeded $41 billion.[7]

44.     Novo Nordisk transacts business in Michigan and County of Macomb, targeting these markets for its products, including the at-issue diabetes medications.

45.     Novo Nordisk employs sales representatives throughout Michigan and County of Macomb to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and

---

[6]   Novo Nordisk A/S, Annual Report (Form 20-F & Form 6-K) (Feb. 3, 2021).

[7]   *Id*.

Ozempic, and it utilizes wholesalers to distribute the at-issue products to pharmacies and healthcare professionals within Michigan, including in County of Macomb.

46.     Novo Nordisk also directs advertising and informational materials to physicians within Michigan and County of Macomb and potential users of Novo Nordisk's products.

47.     At all times relevant hereto, in furtherance of the Illegal Pricing Scheme, Novo Nordisk published its prices of its at-issue diabetes medications throughout Michigan for the purpose of payment and reimbursement by Plaintiff.

48.     During the relevant period, Plaintiff purchased or reimbursed Novo Nordisk's at-issue diabetes medications at prices based on false list prices generated by the Illegal Pricing Scheme through its employee health plans.

49.     All of the Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Michigan based on the specific false and inflated prices Novo Nordisk caused to be published in Michigan in furtherance of the Illegal Pricing Scheme.

50.     Collectively, Eli Lilly, Novo Nordisk, and Sanofi, including all predecessor and successor entities, are referred to as "Manufacturer Defendants" or "Manufacturers."

### C.     The PBM Defendants

**CVS Health Corporation**

51.     Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  It is a citizen of the State of Delaware and the State of Rhode Island.

52.     CVS Health transacts business and has locations throughout the United States, including in Michigan.

53.     CVS Health may be served through its registered agent:

54.     CVS Health – through its executives and employees, including its Chief Executive Officer ("CEO"), Chief Medical Officer ("CMO"), Executive Vice Presidents ("VPs"), Senior Executives in Trade Finance, Senior VPs, and Chief Communication Officers ("CCOs") – is directly involved in creating and implementing the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs involved in the Illegal Pricing Scheme.

55.     CVS Health's conduct had a direct effect in Michigan and damaged Plaintiff as a payor and purchaser.

56.     On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

57.     In each annual report for at least the last decade, CVS Health (or its predecessor) has repeatedly and explicitly stated that CVS Health:[8]

- designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

- negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients; and

- utilizes an independent panel of doctors, pharmacists, and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.

58.     CVS Health publicly represents that CVS Health lowers the cost of the at-issue drugs.  For example, in 2016 CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including in Michigan, stating:

---

[8]     CVS Health Corp., Annual Reports (Form 10-K) (FYE Dec. 31, 2009-2019).

CVS Health introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, ***lower pharmacy costs*** [***for diabetes medications***] through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes.  (emphasis added).

59.     A 2017 CVS Health press release stated that "CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years.  Despite manufacturer price increases of near 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent."

60.     In November 2018, CVS Health acquired Aetna, Inc. ("Aetna") for $69 billion and became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain.  As a result, CVS Health controls the health plan/insurer, the PBM, and the pharmacies utilized by approximately 40 million Aetna members in the United States, including in Michigan. CVS Health controls the entire drug pricing chain for these 40 million Americans.

61.     CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Michigan that dispensed and received payment for the at-issue diabetes medications throughout the relevant period. According to a CVS Health press release, it "maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (including CVS Pharmacy, Inc. locations) and approximately 26,000 independent pharmacies, in the United States."

**CVS Pharmacy, Inc.**

62.     Defendant CVS Pharmacy, Inc. ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at One CVS Drive, Woonsocket, Rhode Island 02895, the same location as CVS Health.  It is a citizen of the State of Rhode Island.

63.     CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Michigan and it is directly involved in these pharmacies dispensing and payment policies related to the at-issue diabetes medications.

64.     CVS Pharmacy also is the immediate and direct parent of Caremark Rx, LLC.

65.     During the relevant period, CVS Pharmacy provided retail pharmacy services in Michigan that gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.

**Caremark Rx, LLC**

66.     Defendant Caremark Rx, LLC ("Caremark Rx") is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management and mail-order subsidiaries that engaged in the activities in Michigan that gave rise to this action.

67.     Caremark Rx is a subsidiary of CVS Pharmacy, which is a wholly owned subsidiary of CVS Health and its principal place of business is at One CVS Drive, Woonsocket, Rhode Island 02895, the same location as CVS Health.  It is a citizen of the State of Delaware and the State of Rhode Island.

68.     During the relevant period, Caremark Rx provided PBM and mail-order pharmacy services in Michigan that gave rise to and implemented the Illegal Pricing Scheme and damaged payors in Michigan, including Plaintiff.

**Caremark LLC**

69.     Defendant Caremark LLC is a California limited liability company whose principal place of business is at One CVS Drive, Woonsocket, Rhode Island 02895, the same location as CVS Health.  It is a citizen of the State of California and the State of Rhode Island.

70.     Caremark LLC is a subsidiary of Caremark Rx, which is a subsidiary of CVS Pharmacy, which is a wholly owned subsidiary of CVS Health.

71.     Caremark LLC is, and has since 2007, been registered to do business in Michigan. Caremark LLC may be served through its registered agent: The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170.

72.     During the relevant period, Caremark LLC provided PBM and mail-order pharmacy services in Michigan and in the County of Macomb that gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.

**CaremarkPCS Health, LLC**

73.     Defendant CaremarkPCS Health, LLC ("CaremarkPCS Health") is a Delaware limited liability company whose principal place of business is at One CVS Drive, Woonsocket, Rhode Island 02895, the same location as CVS Health.  It is a citizen of the State of Delaware and the State of Rhode Island.

74.     CaremarkPCS Health is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Caremark Rx, which is a subsidiary of CVS Pharmacy, which is a wholly owned subsidiary of CVS Health.

75.     CaremarkPCS Health, doing business as CVS Caremark, provides pharmacy benefit management services.

76.     During the relevant period, CaremarkPCS Health provided PBM services in the State of Michigan, which gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.

77.     CaremarkPCS Health and Caremark LLC are agents and/or alter egos of Caremark Rx, CVS Pharmacy, and CVS Health.

- 12 -

78.     As a result of numerous interlocking directorships and shared executives, Caremark Rx, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control CaremarkPCS Health and Caremark LLC's operations, management, and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail-order and retail pharmacy services to the ultimate detriment of Plaintiff.  For example:

(a)     During the relevant period, these parent and subsidiaries have had common officers and directors, including:

- Thomas S. Moffatt, VP and Secretary of Caremark Rx, CaremarkPCS Health, and Caremark LLC, also served as VP, Assistant Secretary, and Senior Legal Counsel at CVS Health and VP, Secretary, and Senior Legal Counsel of CVS Pharmacy;

- Melanie K. Luker, Assistant Secretary of Caremark Rx, CaremarkPCS Health, and Caremark LLC, also served as Manager of Corporate Services at CVS Health;

- Carol A. Denale, Senior VP and Treasurer of Caremark Rx, also served as Senior VP, Treasurer and Chief Risk Officer at CVS Health;

- John M. Conroy was VP of Finance at CVS Health beginning in 2011 and also President and Treasurer of Caremark LLC and CaremarkPCS Health in 2019; and

- Sheelagh Beaulieu served as Senior Director of Income Tax at CVS Health while also acting as the Assistant Treasurer at CaremarkPCS Health and Caremark LLC.

(b)     CVS Health owns all the stock of CVS Pharmacy, which owns all the stock of Caremark Rx, which owns all the stock of Caremark LLC.  CVS Health directly or indirectly owns CaremarkPCS Health in its entirety.

(c)     CVS Health, as a corporate family, does not operate as separate entities.  Its public filings, documents, and statements present its subsidiaries – including CVS Pharmacy, Caremark Rx, Caremark LLC, and CaremarkPCS Health – as divisions or departments of one

unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint.[9]

(d)     All executives of CaremarkPCS Health, Caremark LLC, Caremark Rx, and CVS Pharmacy ultimately report to the executives at CVS Health, including its President and CEO.

(e)     As stated above, CVS Health's CEO, CMO, Executive VPs, Senior Executives in Trade Finance, Senior VPs, and CCOs are directly involved in the policies and business decisions by Caremark LLC and CaremarkPCS Health that give rise to Plaintiff's claims.

79.     Collectively, CVS Health, CVS Pharmacy, Caremark Rx, Caremark LLC, and CaremarkPCS Health, including all predecessor and successor entities, are referred to as "CVS Caremark."

80.     CVS Caremark is named as a Defendant in its capacities as a PBM and as a mail-order pharmacy.

81.     In its capacity as a PBM, CVS Caremark coordinated with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

---

[9]     CVS Health Corp., Annual Report (Form 10-K) (Reporting dates Dec. 31, 2009-2019); CVS Health, *Our Purpose*, https://cvshealth.com/about-cvs-health/our-purpose (last visited Sept. 6, 2023); CVS Health, *Quality of Care*, http://web.archive.org/web/20210416030940/https://cvshealth.com/health-with-heart/improving-health-care/quality-of-care (last visited Sept. 6, 2023).

82.     CVS Caremark has the largest PBM market share based on total prescription claims managed.  Its pharmacy services segment provides, among other things, "plan design offerings and administration, formulary management, retail pharmacy network management services, mail-order pharmacy, specialty pharmacy and infusion services, clinical services and medical spend management."  In 2021, CVS Caremark's pharmacy services segment "surpassed expectations" and had a "record selling season of nearly $9 billion in net new business wins for 2022."  In all, it generated just over $153 billion in total revenues (on top of total 2019-2020 segment revenues exceeding $283 billion).[10]

83.     At all relevant times, CVS Caremark offered pharmacy benefit services nationwide including Michigan payors, and derived substantial revenue therefrom, and, in doing so, made misrepresentations while concealing the Illegal Pricing Scheme, and it utilized the false prices generated by the Illegal Pricing Scheme.

84.     At all relevant times, CVS Caremark offered PBM services nationwide and maintained standard formularies that were used nationwide, including in Michigan.  Those formularies included diabetes medications, including those at issue in this action, and it participated in pricing the at-issue drugs based off the list prices it knew to be false.

85.     CVS Caremark purchased drugs directly from manufacturers for dispensing through its pharmacy network.

86.     In its capacity as a retail pharmacy, CVS Caremark further and knowingly profited from the false list prices produced by the Illegal Pricing Scheme by pocketing the spread between acquisition cost for the at-issue drugs (an amount well below the list price generated by the Illegal

---

[10]   CVS Health Corp., Annual Report (Form 10-K) (Feb. 9, 2022).

Pricing Scheme), and the amounts it received from payors (which amounts were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

87.     During the relevant period, CVS Caremark provided mail-order and retail pharmacy services nationwide and within the State of Michigan and employed prices based on the false list prices generated by the Illegal Pricing Scheme.

88.     At all relevant times, CVS Caremark dispensed the at-issue medications nationwide within the State of Michigan through its mail-order and retail pharmacies and it derived substantial revenue from these activities in Michigan.

89.     At all relevant times, CVS Caremark had express agreements with Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail-order pharmacies.

**Evernorth Health, Inc.**

90.     Defendant Evernorth Health, Inc. ("Evernorth"), formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at One Express Way, St. Louis, Missouri 63121.  It is a citizen of the State of Delaware and the State of Missouri.

91.     Evernorth, through its executives and employees, including its CEO and VPs, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs related to the Illegal Pricing Scheme.

92.     Evernorth's conduct had a direct effect in Michigan and upon Plaintiff.

93.     On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

94.     Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Michigan, who engaged in the activities that gave rise to this action.[11]

95.     In 2018, Evernorth merged with Cigna Corporation ("Cigna") in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy.  As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 15 million Cigna members in the United States, including in Michigan.  Evernorth controls the entire drug pricing chain for these 15 million Americans.

96.     Evernorth's annual reports over the past several years have repeatedly and explicitly:[12]

- acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."

- stated that Evernorth controls costs, including for example, that it: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost- effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."

97.     Even after the merger with Cigna, Evernorth "operates various group purchasing organizations that negotiate pricing for the purchase of pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the company's Pharmacy Rebate Program while its subsidiary Express Scripts provides "formulary management

---

[11]   Express Scripts Inc., Annual Report (Form 10-K) Ex. 21 (Feb. 27, 2018).

[12]   Express Scripts Inc., Annual Reports (FYE 2009-2019); Cigna, Annual Report (Form 10-K) (FYE 2021-2022).

services" that ostensibly "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability."   In 2021, Evernorth reported adjusted revenues of $131.9 billion (representing 75.8% of Cigna's revenues), which was up from $116.1 billion in 2020.[13]

**Express Scripts, Inc.**

98.     Defendant Express Scripts, Inc. is a Delaware corporation and is a wholly owned subsidiary of Evernorth.  Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.  It is a citizen of the State of Delaware and the State of Missouri.

99.     Express Scripts, Inc. is and has since 1999 been registered to do business in Michigan and may be served through its registered agent: CT Corporation System, 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170.

100.     Express Scripts, Inc. holds one or more wholesaler licenses in Michigan.

101.     Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Michigan that engaged in the conduct, which gave rise to this action.[14]

102.     During the relevant period, Express Scripts, Inc. was directly involved in PBM and mail-order pharmacy services that gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.

103.     Indeed, Express Scripts, Inc. provided pharmacy benefit services to Plaintiff until January 1, 2022, for its active employees and until January 1, 2023, for its retired employees based

---

[13]   Cigna Corp., Annual Report (Form 10-K) (Feb. 24, 2022).

[14]   Express Scripts Inc., Annual Report (Form 10-K) Ex. 21 (Feb. 27, 2018).

on Plaintiff's reliance upon Express Scripts, Inc.'s response to County of Macomb's request for proposals and upon other representations made to the County of Macomb and/or its agents in the formation and maintenance of the relationship.

**Express Scripts Administrators, LLC**

104.    Defendant    Express    Scripts    Administrators,    LLC    ("Express    Scripts Administrators"), doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Its principal place of business is at 100 Parsons Pond Drive, Franklin Lakes, New Jersey 07417.  It is a citizen of the State of Delaware and the State of New Jersey.

105.    Express Scripts Administrators is registered to do business in Michigan and may be served through its registered agent: CT Corporation System, 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170.

106.    During the relevant period, Express Scripts Administrators provided the PBM services in Michigan that gave rise to and implemented the Illegal Pricing Scheme that damaged payors, including Plaintiff.

**Medco Health Solutions, Inc.**

107.    Defendant Medco Health Solutions, Inc. ("Medco") is a Delaware Corporation whose principal place of business is at the same location as Evernorth.  It is a citizen of the State of Delaware and the State of Missouri.

108.    In 2012, Express Scripts acquired Medco for $29 billion.

109.    Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States, including in Michigan.

110.   Prior to the merger, Medco provided the at-issue PBM and mail-order services in Michigan, which gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.

111.   Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts.  The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers, including Plaintiff.  The combined company covered over 155 million lives at the time of the merger.

112.   At the time of the merger, on December 6, 2011, in his testimony before the U.S. Senate Committee on the Judiciary ("Senate Judiciary Committee"), then-CEO of Medco David Snow publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers.  This is because our combined entity will achieve even greater purchasing volume discounts [Manufacturer Payments] from drug manufacturers and other suppliers."[15]

113.   At the same time, the then-CEO of Express Scripts, George Paz ("Paz"), provided written testimony to the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy and Consumer Rights stating, "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."  First on

---

[15]   David B. Snow, Jr., Chairman and Chief Executive Officer, Medco Health Solutions, Inc., *Senate Committee on the Judiciary, Subcommittee on Antitrust, Competition Policy and Consumer Rights Hearing on the Proposed Merger between Express Scripts and Medco* (Dec. 6, 2011), https://www.judiciary.senate.gov/imo/media/doc/11-12-6SnowTestimony.pdf.

Paz's list of "benefits of this merger" was "[g]enerating greater cost savings for patients and plan sponsors."[16]

**ESI Mail Pharmacy Service, Inc.**

114.    Defendant ESI Mail Pharmacy Service, Inc. ("ESI Mail Pharmacy Service") is a Delaware corporation and is a wholly owned subsidiary of Evernorth.  ESI Mail Pharmacy Service's principal place of business is at One Express Way, St. Louis, Missouri 63121, the same location as Evernorth.  It is a citizen of the State of Delaware and the State of Missouri.

115.    During the relevant period, ESI Mail Pharmacy Service provided the mail-order pharmacy services in Michigan discussed in this Complaint, which gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.

**Express Scripts Pharmacy, Inc.**

116.    Defendant Express Scripts Pharmacy, Inc. ("Express Scripts Pharmacy") is a Delaware corporation and is a wholly owned subsidiary of Evernorth.  Express Scripts Pharmacy's principal place of business is at One Express Way, St. Louis, Missouri 63121, the same location as Evernorth.  It is a citizen of the State of Delaware and the State of Missouri.

117.    During the relevant period, Express Scripts Pharmacy provided the mail-order pharmacy services in Michigan that gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.

118.    As a result of numerous interlocking directorships and shared executives, Evernorth (f/k/a Express Scripts Holding Company) and Express Scripts, Inc. control Express Scripts

---

[16]   Written Testimony of George Paz Chairman and Chief Executive Officer Express Scripts Inc. Before the Senate Judiciary Committee Subcommittee on Antitrust, Competition Policy and Consumer Rights Hearing on The Proposed Merger between Express Scripts and Medco (Dec. 6, 2011), https://www.judiciary.senate.gov/imo/media/doc/11-12-6PazTestimony.pdf.

Administrators, ESI Mail Pharmacy Service, Medco, and Express Scripts Pharmacy's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Plaintiff.  For example:

(a)     During the relevant period, these parent and subsidiaries have had common officers and directors:

- Officers and/or directors shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer ("CFO"); David Queller, President; Jill Stadelman, Managing Counsel; Dave Anderson, VP of Strategy; Matt Perlberg, President of Pharmacy Businesses; Bill Spehr, Senior VP of Sales; and Scott Lambert, Treasury Manager Director;

- Executives shared between Express Scripts Administrators and Evernorth include Bradley Phillips, CFO; and Priscilla Duncan, Associate Senior Counsel;

- Officers and/or directors shared between ESI Mail Pharmacy Service and Evernorth include Bradley Phillips, CFO; Priscilla Duncan, Associate Senior Counsel; and Joanne Hart, Treasury Director; and

- Officers and/or directors shared between Express Scripts Pharmacy and Evernorth include Bradley Phillips, CFO; Jill Stadelman, Managing Counsel; Scott Lambert, Treasury Manager Director; and Joanne Hart, Treasury Director.

(b)     Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, Medco, ESI Mail Pharmacy Service, Express Scripts Pharmacy, and Express Scripts, Inc.[17]

(c)     The Evernorth corporate family does not operate as separate entities. Evernorth's public filings, documents, and statements present its subsidiaries, including Express Scripts Administrators, ESI Mail Pharmacy Service, Express Scripts Pharmacy and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as

---

[17]   Express Scripts Inc., Annual Report (Form 10-K) Ex. 21 (Feb. 27, 2018).

many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people."  The day-to-day operations of this corporate family reflect these public statements.  All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.[18]

(d)     All of the executives of Express Scripts Administrators, ESI Mail Pharmacy Service, Express Scripts Pharmacy, and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

(e)     As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, ESI Mail Pharmacy Service, Medco, Express Scripts Pharmacy, and Express Scripts, Inc. that gave rise to Plaintiff's claims in this Complaint.

119.    Collectively, Evernorth, Express Scripts, Inc., Express Scripts Administrators, ESI Mail Pharmacy Service, Medco, and Express Scripts Pharmacy, including all predecessor and successor entities, are referred to as "Express Scripts."

120.    Express Scripts is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

121.    In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Scripts' formularies.

---

[18]    Express Scripts Inc., Annual Reports (Form 10-K) (FYE 2009-2019); Evernorth, https://www.evernorth.com/ (last visited Sept. 6, 2023).

122.    Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States.[19]

123.    During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States. Express Scripts has only grown larger since the Cigna merger.

124.    In 2017, annual revenue for Express Scripts was over $100 billion.[20]

125.    As of December 31, 2018, more than 68,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.

126.    Express Scripts transacts business throughout the United States, including in Michigan.

127.    At all relevant times, Express Scripts derived substantial revenue from providing retail and mail-order pharmacy benefits in Michigan using prices based on the false list prices for the at-issue drugs.

128.    At all relevant times, and contrary to all of its express representations, Express Scripts knowingly insisted that its payor clients, including Plaintiff, use the false list prices produced by the Illegal Pricing Scheme as the basis for reimbursement of the at-issue drugs.

129.    At all times relevant hereto, Express Scripts concealed its critical role in the generation of those false list prices.

130.    At all times relevant hereto, Express Scripts maintained standard formularies that are used nationwide, including in the State of Michigan.  During the relevant period, those

---

[19]    Express Scripts Inc., Annual Report (Form 10-K) (Feb. 27, 2018).

[20]    *Id.*

formularies included drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications.

131.    During the relevant period, Express Scripts provided PBM services to Plaintiff and, in doing so, Express Scripts set the price that Plaintiff paid for the at-issue drugs at prices based on the false list prices generated by the Illegal Pricing Scheme and Plaintiff paid Express Scripts for the at-issue drugs.

132.    In its capacity as a mail-order pharmacy, Express Scripts received payments from Michigan payors (including Plaintiff) for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Illegal Pricing Scheme and, as a result, damaged Plaintiff.

133.    At all relevant times, Express Scripts offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Michigan.  Those formularies included diabetes medications, including all those identified in this Complaint.

134.    Express Scripts purchases drugs directly from manufacturers for dispensing through its pharmacy network.

135.    During the relevant period, Express Scripts dispensed the at-issue medications nationwide and directly to Plaintiff and/or its Beneficiaries through its mail-order pharmacies and derived substantial revenue from these activities in Michigan.

136.    During the relevant period, in addition to its critical role in the Illegal Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, Express Scripts also provided PBM services to Plaintiff.

137.    During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement.  For example, in a February 2014 email released by the U.S. Senate in conjunction with its January 2021 report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug," Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (who later would become part of Express Scripts).[21]

138.    At all relevant times, Express Scripts had express agreements with Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' pharmacies.

**UnitedHealth Group, Inc.**

139.    Defendant UnitedHealth Group, Inc. ("UnitedHealth") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  It is a citizen of the State of Delaware and the State of Minnesota.

140.    UnitedHealth is a diversified managed healthcare company.  Its total revenues in 2021 exceeded $287 billion, which was up more than $30 billion from 2020.  The company currently is ranked fifth on the Fortune 500 list.[22]

---

[21]   Letter from Joseph B. Kelley, Eli Lilly Vice President, Glob. Gov't Affairs, to Hon. Charles E. Grassley & Hon. Ron Wyden, Sen. Fin. Comm., (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf.

[22]   UnitedHealth Group, Inc., Annual Report (Form 10-K) (Feb. 15, 1011).

141.    UnitedHealth offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

142.    Over one-third of the overall revenues of UnitedHealth come from OptumRx, which operates a network of more than 67,000 pharmacies.

143.    UnitedHealth, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Illegal Pricing Scheme.   For example, UnitedHealth executives structure, analyze, and direct the company's overarching policies, including with respect to PBM and mail-order services, as a means of maximizing profitability across the corporate family.

144.    UnitedHealth's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [UnitedHealth] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [UnitedHealth] also operate[s] [mail order pharmacies][UnitedHealth] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

145.    In addition to being a PBM and a mail-order pharmacy, UnitedHealth owns and controls a major health insurance company, UnitedHealthcare.  As a result, UnitedHealth controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by more than 26 million UnitedHealthcare members in the United States, including in Michigan.  UnitedHealth controls the entire drug pricing chain for these 26 million Americans.

146.    UnitedHealth's conduct had a direct effect in Michigan and damaged Plaintiff.

147. UnitedHealth states in its annual reports that UnitedHealth "utilizes Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience." Its most recent annual report states plainly that it is "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsors' members …." As of December 31, 2021, "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidated Balance Sheets amounted to $7.2 billion [2021] and $6.3 billion [2020]."[23]

**Optum, Inc.**

148. Defendant Optum, Inc. is a Delaware corporation with its principal place of business located at 1100 Optum Circle, Eden Prairie, Minnesota 55344. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including OptumRx, Inc. UnitedHealth Group, Annual Report (Form 10-K) Ex. 21 (Feb. 12, 2019). It is a citizen of the State of Delaware and the State of Minnesota.

149. Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Illegal Pricing Scheme, which had a direct effect in Michigan and damaged Plaintiff.

150. For example, according to Optum, Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform

---

[23] UnitedHealth Group Inc., Annual Report (Form 10-K) (Feb. 12, 2019); UnitedHealth Group Inc., Annual Report (Form 10-K) Ex. 21 (Feb. 15, 2022).

serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers."   In this role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth, and OptumRx" and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail-order activities.

**OptumRx, Inc.**

151.    Defendant OptumRx, Inc. is a California corporation with its principal place of business at 2300 Main Street, Irvine, California 92614.  It is a citizen of the State of California.

152.    OptumRx, Inc., operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Optum, Inc.

153.    OptumRx, Inc. is and has since 2008 been registered to do business in Michigan (operating until 2011 under the name RxSolutions, Inc.).  OptumRx, Inc. may be served through its registered agent: The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170.

154.    During the relevant period, OptumRx, Inc. provided the PBM and mail-order pharmacy services in Michigan that gave rise to and implemented the Illegal Pricing Scheme, which damaged payors, including Plaintiff.  OptumRx provided PBM services to Plaintiff from January 1, 2022 to the present for its active employees and from January 1, 2023 for its retirees based on Plaintiff's reliance upon OptumRx's response to Plaintiff's request for proposals and upon other representations made in the formation and maintenance of relationship.

**OptumInsight, Inc.**

155.    Defendant OptumInsight, Inc. ("OptumInsight") is a Delaware corporation with its principal place of business located at 12125 Technology Drive, Eden Prairie, Minnesota 55344.  It is a citizen of the State of Delaware and the State of Minnesota.

156.    OptumInsight is an integral part of the Illegal Pricing Scheme and, during the relevant period, coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy.  OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants with regard to the profitability of the Illegal Pricing Scheme to the benefit of all Defendants.

157.    As a result of numerous interlocking directorships and shared executives, UnitedHealth, OptumRx Holdings, LLC and Optum, Inc. are directly involved in the conduct of and control OptumInsight's and OptumRx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Plaintiff. For example:

(a)    These parent and subsidiaries have common officers and directors, including:

- Andrew Witty is the CEO and on the Board of Directors for UnitedHealth and previously served as CEO of Optum, Inc.;

- Dirk McMahon is President and COO of UnitedHealth. He served as President and COO of Optum from 2017 to 2019 and as CEO of OptumRx from 2011 to 2014;

- John Rex has been an Executive VP and CFO of UnitedHealth since 2016 and previously served in the same roles at Optum beginning in 2012;

- Dan Schumacher is Chief Strategy and Growth Officer at UnitedHealth and is CEO of OptumInsight, having previously served as President of Optum, Inc.;

- Terry Clark is a Senior VP and has served as Chief Marketing Officer at UnitedHealth since 2014 while also serving as Chief Marketing and Customer Officer for Optum;

- Tom Roos has served since 2015 as Senior VP and Chief Accounting Officer for UnitedHealth and Optum, Inc.;

- Heather Cianfrocco ("Cianfrocco") joined UnitedHealth in 2008 and has held numerous leadership positions within the company while today she is CEO of OptumRx;

- Peter Gill has served as Senior VP and Treasurer for UnitedHealth and also as Treasurer at OptumRx, Inc. and OptumRx PBM of Illinois, Inc.;

- John Santelli led Optum Technology, the leading technology division of Optum, Inc. serving the broad customer base of Optum and UnitedHealthcare and also served as UnitedHealth's Chief Information Officer; and

- Eric Murphy, now retired, was the Chief Growth and Commercial Officer for Optum, Inc. and also was CEO of OptumInsight beginning in 2017.

(b)     UnitedHealth directly or indirectly owns all the stock of Optum, Inc., OptumRx, Inc. and OptumInsight.

(c)     The UnitedHealth corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth present its subsidiaries, including Optum, Inc., OptumRx, Inc., and OptumInsight as divisions, departments or "segments" of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone."  The day-to-day operations of this corporate family reflect these public statements.  These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.[24]

---

[24]   UnitedHealth Group Inc., Quarterly Report (Form 10-Q) (May 8, 2017).

(d)     All the executives of Optum, Inc., OptumRx, Inc., and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth.

(e)     As stated above, UnitedHealth's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumRx, Inc., and OptumInsight that gave rise to Plaintiff's claims.

158.     Collectively, UnitedHealth, OptumRx, Inc., OptumInsight, and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

159.     OptumRx is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

160.     OptumRx is a PBM and, as such, coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on OptumRx's drug formularies.

161.     OptumRx provides pharmacy care services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.  It is one of UnitedHealth's "four reportable segments" (along with UnitedHealthcare, Optum Health, and OptumInsight).   In 2021, OptumRx "managed $112 billion in pharmaceutical spending, including $45 billion in specialty pharmaceutical spending."[25]

162.     In 2018, OptumRx managed more than $91 billion in pharmaceutical spending, representing 23% of the PBM market in the United States. OptumRx's 2018 revenue was $69 billion.[26]

---

[25]   UnitedHealth Group, Annual Report (Form 10-K) (Feb. 15, 2022).

[26]   *Id.*

163.     In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with revenue of $74 billion. By 2021, it had risen to $91.3 billion.[27]

164.     At all relevant times, OptumRx derived substantial revenue from providing pharmacy benefits in Michigan.

165.     At all relevant times, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Michigan. Those formularies included diabetes medications, including those at issue in this action.

166.     OptumRx purchased drugs directly from Manufacturers for dispensing through its pharmacy network, including to Plaintiff and its Beneficiaries.

167.     At all relevant times, and contrary to its express representations, OptumRx knowingly insisted that its payor clients, including Plaintiff, use the false list prices produced by the Illegal Pricing Scheme as the basis for reimbursement of the at-issue drugs.

168.     At all relevant times, OptumRx concealed its critical role in the generation of those false list prices.

169.     In its capacity as a mail-order pharmacy with a contracted network of retail pharmacies, OptumRx received payments from payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Illegal Pricing Scheme and, as a result, damaged Plaintiff.

170.     At all relevant times, OptumRx dispensed the at-issue medications nationwide and directly to Plaintiff and Plaintiff's Beneficiaries in Michigan through its mail-order and retail pharmacies and derived substantial revenue from these activities in Michigan.

---

[27]   *Id.*; UnitedHealth Group, Annual Report (Form 10-K) (Feb. 14, 2020).

171. OptumRx purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail-order pharmacies and network of retail pharmacies.

172. At all relevant times, OptumRx had express agreements with Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx pharmacies.

173. CVS Caremark, OptumRx, and Express Scripts are collectively referred to as the "PBM Defendants."

## III. JURISDICTION AND VENUE

174. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337 and pursuant to 18 U.S.C. §1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. §1367.

175. This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is admitted to do business within Michigan; (b) maintains substantial contacts in Michigan; and (c) committed the violations of Michigan statutes, federal statutes, and common law at issue in this action in whole or part within the State of Michigan. This action arises out of and relates to each Defendant's contacts with this forum.

176. The Illegal Pricing Scheme has been directed at, and has had the foreseeable and intended effect of causing injury to persons residing in, located in, or doing business in Michigan, including Plaintiff.

177.     Each Defendant purposefully availed itself of the privilege of doing business within this state, including within this District and division; and each derived substantial financial gain from doing so.  These continuous, systematic, and case-related business contacts – including the acts described herein – are such that each Defendant should reasonably have anticipated being brought into this Court.

178.     Each Defendant submitted itself to jurisdiction through pervasive marketing; through encouraging the use of its services; and through its purposeful cultivation of profitable relationships in the State of Michigan and within this forum.  Each had direct interactions with Plaintiff concerning drug pricing.

179.     In short, each Defendant has systematically served a market in Michigan relating to the Illegal Pricing Scheme and has caused injury in Michigan such that there is a strong relationship among Defendants, this forum, and the litigation.

180.     This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Michigan.

181.     This Court also has personal jurisdiction over all Defendants under 18 U.S.C. §1965(b).  This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before this Court in a single action for a single trial.

182.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and because a substantial part of the events or omissions giving rise to this action took place, or had their ultimate

injurious impact, within this District.  In particular, at all times during the relevant period, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold diabetes medications, published prices of the at issue drugs in this District, and caused injury to Plaintiff in this District.

183.    Venue is also proper in this District pursuant to 18 U.S.C. §1965, because all Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

184.    This action is directly filed in *In Re: Insulin Pricing Litigation*, MDL No. 3080, which was established on August 3, 2023, pursuant to the United States Judicial Panel on Multidistrict Litigation transfer order, and in accordance with this Court's August 2023 "Instructions for Opening a Case Relevant to MDL 3080".

185.    Proper "Home Venue" for this matter is in the Southern/Detroit Division of the U.S. District Court for the Eastern District of Michigan under 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in that District.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    The Stakeholders in the Insulin Market

186.    The cost of diabetes medications has skyrocketed over the past 20 years.  Over that time, the average cost of consumer goods and services has risen 1.75-fold.  The cost of some diabetes medications has risen more than 10-fold.  These price increases are not due to the rising cost of goods, production costs, investment in research and development ("R&D"), or competitive market forces.  These price increases have been engineered by Defendants to exponentially increase their profits at the expense of payors, like Plaintiff, and their plan members. It is a multibillion-dollar industry.

- 36 -

187. The Manufacturer Defendants manufacture the vast majority of insulins and other diabetes medications available in the United States.

188. In 2020 – as in years past – the Manufacturer Defendants controlled 92% (by volume) and 96% (by revenue) of the global market for diabetes drugs.

189. For purposes of this Complaint, the "at-issue drugs" or "at-issue medications" are: Apidra, Basaglar, Humalog, Humulin N, Humulin R, Humulin R 500, Humulin 70/30, Lantus, Levemir, Novolin N, Novolin R, Novolin 70/30, Novolog, Ozempic, Soliqua, Toujeo, Tresiba, Trulicity, and Victoza.

190. CVS Caremark, Express Scripts, and OptumRx are PBMs that work in concert with the Manufacturer Defendants to dictate the availability and price of the at-issue drugs for most of the U.S. market.

191. The PBM Defendants are, at once: (a) the three largest PBMs in the United States (controlling more than 80% of the PBM market); (b) the largest pharmacies in the United States (comprising three of the top five dispensing pharmacies in the United States); and (c) housed within the same corporate families as three of the largest insurance companies in the United States – Aetna (CVS Health), Cigna (Express Scripts), and UnitedHealthcare (OptumRx).

192. These Defendant corporate conglomerates sit at 4th (CVS Health), 5th (UnitedHealth), and 12th (Cigna) on the Fortune 500 list as of year-end 2022.

**B.    Diabetes and Insulin Therapy**

193. Diabetes occurs when a person's blood glucose is too high. In people without diabetes, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to blood glucose.  When insulin is lacking or when cells stop responding to insulin,

blood sugar stays in the bloodstream.  Over time, this can cause serious health problems, including heart disease, blindness, and kidney disease.

194.    There are two basic types of diabetes – Type 1 and Type 2. Roughly 90%-95% of diabetics are Type 2, which develops when one does not produce enough insulin or has become resistant to the insulin one produces.  While Type 2 patients can initially be treated with tablets, in the long term most patients have to switch to insulin injections.

195.    Diabetes has been on the rise for decades. In 1958, only 1.6 million Americans had diabetes.  By the turn of the century, however, that number had grown to over ten million.  Fourteen years later, the number had tripled.  Today, more than 37 million Americans – approximately 11% of the country – live with the disease.

196.    The prevalence of diabetes in Michigan has increased as well. Nearly one million Michiganders have been diagnosed as diabetic.[28]

197.    Despite its potential lethality, diabetes is highly treatable. Patients able to follow a prescribed treatment plan consistently avoid severe health complications associated with the disease.

198.    Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

199.    In 1922, Frederick Banting ("Banting") and Charles Best ("Best"), while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent to $18 today), explaining that "[w]hen the details of the

---

[28]  American Diabetes Association, *The Burden of Diabetes in Michigan* (Oct. 2021), https://diabetes.org/sites/default/files/2021-11/ADV_2021_State_Fact_sheets_Michigan_rev.pdf.

method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[29]

200.    After purchasing the patent, the University of Toronto contracted with Eli Lilly and Novo Nordisk to scale its production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

201.    The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.  While effective, animal-derived insulin created the risk of allergic reaction. This risk was reduced in 1982 when synthetic insulin – known as human insulin because it mimics the insulin humans make – was developed by Eli Lilly.  Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institutes of Health and the American Cancer Society.

202.    In the mid-1990s, Eli Lilly introduced the first analog insulin – a laboratory-grown and genetically altered insulin.  Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body and more quickly lower blood sugar.  Eli Lilly released this analog in 1996 under the brand name Humalog at a cost of $21 per vial (equivalent to $40 in 2022).

203.    Other rapid-acting analogs include Novo Nordisk's Novolog and Sanofi's Apidra, which have similar profiles.  Rapid-acting insulins are used in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

204.    The Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

---

[29]    Bliss, *supra* note 1.

205.    In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus.  Toujeo, however, is highly concentrated, reducing injection volume as compared to Lantus.

206.    In December 2015, Eli Lilly introduced Basaglar – a long-acting insulin that is biologically similar to Sanofi's Lantus.

207.    Even though insulin was first extracted 100 years ago, and despite its profitability, only Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin for the United States market.  This did not occur by chance.

208.    Many of the at-issue medications are now off-patent.  The Manufacturers maintain market domination through patent "evergreening."  Drugs usually face generic competition when their 20-year patents expire.  While original insulin formulas may technically be available for generic use, the Manufacturers "stack" patents around the original formulas, making new competition more costly and risky.  For example, Sanofi has filed more than 70 patents on Lantus – more than 95% were filed after the drug was approved by the U.S. Food and Drug Administration ("FDA") – potentially providing more than three additional decades of patent "protection" for the drug.  The market, thus, remains concentrated.

209.    While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions about whether the overall efficacy of insulin has significantly improved over the last 20 years.

210.    For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes.  Recent work suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

211.    Moreover, all insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

212.    As Dr. Kasia Lipska, a Yale researcher, explained in the Journal of the American Medical Association:

> "We're not even talking about rising prices for better products here," . . . "I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more."[30]

213.    Production costs have decreased in recent years.  A September 2018 study in BMJ Global Health calculated that, based on production costs, a reasonable and profitable price for a year's supply of human insulin is between $48 and $71 per person (and between $78 and $133 for analog insulins).  Another recent study found that the Manufacturers could be profitable charging as little as $2 per vial.

214.    Yet diabetics spent an average of $5,705 for insulin in 2016.  According to a 2020 RAND report, the 2018 list price per vial across all forms of insulin was just $14.40 in Japan, $12.00 in Canada, $11.00 in Germany, $9.08 in France, $7.52 in the United Kingdom, and less than $7.00 in Australia.  In the United States it was $98.70.

215.    While R&D costs often contribute significantly to the price of a drug, the initial basic insulin research – original drug discovery and patient trials – occurred 100 years ago.  Even more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago.  In recent years, the lion's share of R&D costs are

---

[30] Natalie Shure, *The Insulin Racket*, American Prospect (June 24, 2019), https://prospect.org/health/insulin-racket/.

incurred in connection with the development of new insulin-related devices and equipment, not in connection with the drug formulations themselves.

216.    The Manufacturer Defendants recently announced limited pricing changes and out-of-pocket limits.

217.    On March 1, 2023, Eli Lilly announced that it would reduce the prices of certain insulin medications, capping those prices at $35 per month, with additional reductions to follow later in the year.  Specifically, Eli Lilly promised that it would list its Lispro injection at $25 per vial effective May 1, 2023, and slash the price of its Humalog and Humulin injections by 70% starting in the fourth quarter of 2023.  The price reductions to date are limited to these medications and do not apply to other Eli Lilly diabetes medications like Trulicity and Basaglar.  These decisions suggest that the prices of these medications before March 1, 2023, were not inflated in order to cover costs of R&D, manufacture, distribution, or any other necessary expense.

218.    On March 14, 2023, Novo Nordisk announced that it would lower the U.S. list prices of several insulin products by up to 75% – specifically, Levemir, Novolin, NovoLog, and NovoLog Mix 70/30.  Novo Nordisk will also reduce the list price of unbranded biologics to match the lowered price of each respective branded insulin.  The price reductions to date are limited to these medications and do not apply to other Novo Nordisk diabetes medications like Victoza and Ozempic.  These changes will go into effect on January 1, 2024, and, as with Eli Lilly's price reduction, suggest that the prices of these medications before that date were not inflated in order to cover costs of R&D, manufacture, distribution, or any other necessary expense.

219.    On March 16, 2023, Sanofi announced that it would also cap the out-of-pocket cost of its most popular insulin, Lantus, at $35 per month for people with private insurance, effective January 1, 2024, and lower the list price of Lantus by 78% and Apidra, its short-acting insulin, by

70%. Sanofi already capped the price of Lantus at $35 for uninsured patients.  The price reductions to date are limited to these medications and do not apply to other Sanofi diabetes medications like Toujeo and Soliqua.  Sanofi's decisions, like Eli Lilly's and Novo Nordisk's, suggest that the prices of Sanofi's medications before January 1, 2024, were not inflated in order to cover costs of R&D, manufacture, distribution, or any other necessary expense.

220.    These three announcements ("Price Cuts") are prospective and do not mitigate damages already incurred by payors like Plaintiff.

221.    The Price Cuts are limited to certain insulin medications, and do not encompass all at-issue medications.  As part of the Illegal Pricing Scheme, PBMs provide preferred formulary placement to the most expensive insulins based on list prices.  Accordingly, the Illegal Pricing Scheme will proceed, with the PBMs continuing to target the most expensive at-issue medications, which will likely be the at-issue medications not included in the Price Cuts.

222.    The Price Cuts are woefully insufficient.  An Eli Lilly spokeswoman has represented that the current list price for a 10-milliliter vial of the fast-acting, mealtime insulin Humalog will drop to $66.40 from $274.70, and a 10-milliliter vial of Humulin will fall from $148.70 to $44.61.[31]  These prices far exceed the Manufacturer Defendants' costs and remain significantly higher than the prices for the same and similar drugs in other countries.

223.    Indeed, the Price Cuts were not the result of a sudden drop in the cost of producing insulin.  Rather, it was the result of ongoing public pressure against the continuing high cost of insulin. Eli Lilly determined to cut prices on its insulin products so it would get the most publicity

---

[31]    Tom Murphy, *Lilly plans to slash some insulin prices, expand cost cap*, AP News (Mar. 2, 2023),   https://apnews.com/article/insulin-diabetes-humalog-humulin-prescription-drugs-eli-lilly-lantus-419db92bfe554894bdc9c7463f2f3183.

for cutting prices first.  As they had in the past, Sanofi and Novo Nordisk followed that lead in lockstep and immediately followed suit and dropped their own prices.

224.    The Price Cuts also demonstrate that the supracompetitive prices that had previously been charged as set forth below were not the result of market forces, but rather the result of Defendants' concerted plan to squeeze as many dollars as possible for themselves out of the insulin revenue stream.

## C.    Other Diabetes Treatments

225.    Over the past decade, the Manufacturer Defendants released a number of non-insulin medications that help control insulin levels. In 2010, Novo Nordisk released Victoza, and over the next seven years Eli Lilly released Trulicity, Sanofi released Soliqua, and Novo Nordisk followed up with Ozempic.[32]  Each of these drugs can be used in conjunction with insulins to control diabetes.

226.    The following is a list of diabetes medications at issue in this lawsuit:

**Table 1: Diabetes medications at issue in this case**

| Insulin Type | Action | Name | Company | FDA Approval | Current/Recent List Price |
|---|---|---|---|---|---|
| **Human** | *Rapid-Acting* | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | *Intermediate* | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |

---

[32]    Victoza, Trulicity, and Ozempic are glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone produced in the body.  Soliqua is a combination long-acting insulin and GLP-1 drug.

| | | | | | |
|---|---|---|---|---|---|
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| **Analog** | *Rapid-Acting* | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | *Long-Acting* | Lantus | Sanofi | 2000 | $340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $370 (vial) $555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2015 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| **Type 2 Medications** | | Trulicity | Eli Lilly | 2014 | $1013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens) $1220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1022 (pens) |
| | | Soliqua | Sanofi | 2016 | $928 (pens) |

### D.     The Dramatic Rise in the Price of Diabetes Medications in the United States

227.    In the past 25 years, the list price of certain insulins has increased in some cases by more than 1000% (10x).  By contrast, according to the U.S. Bureau of Labor Statistics, $165 worth of consumer goods and services in 1997 dollars would, in 2021, have cost $289 (1.75x).[33]

228.    Since 1997, Eli Lilly has raised the list price of a vial of Humulin R (500U/mL) from $165 to $1784 in 2021 (10.8x).  (*See* Figure 3 below).

Figure 3: Rising list prices of Humulin R (500U/mL) from
1997-2021



---

[33] U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm (last visited Sept. 6, 2023).  The Consumer Price Index (CPI) measures "the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services."  U.S. Bureau of Labor Statistics, Consumer Price Index, https://www.bls.gov/cpi/ (last visited Sept. 6, 2023).

229. Since 1996, Eli Lilly has raised the price for a package of pens of Humalog from under $100 to $663 (6.6x) and from less than $50 for a vial to $342 (6.8x).  (*See* Figure 4 below).

Figure 4: Rising list prices of Humalog vials and pens from 1996-2021



230.    From 2006 to 2021, Novo Nordisk's Levemir rose from $162 to $555 (3.4x) for pens and from under $100 to $370 per vial (3.7x).  (*See* Figure 5 below).

Figure 5: Rising list prices of Levemir from 2006-2021



231.    From 2002 to 2021, Novo Nordisk raised the list price of Novolog from $108 to $671 (6.2x) for a package of pens and from less than $50 to $347 (6.9x) for a vial.  (*See* Figure 6 below).

Figure 6: Rising list prices of Novolog vials and pens from 2002-2021



232.   Sanofi has kept pace as well.  It manufactures a top-selling analog insulin – Lantus – which has been and remains a flagship brand for Sanofi.  It has been widely prescribed nationally and within the State of Michigan, including to Plaintiff's Beneficiaries.  Prices for Lantus have risen from less than $200 in 2006, to over $500 in 2020 (2.5x) for a package of pens and from less than $50 to $340 for a vial (6.8x).  (*See* Figure 7 below).

Figure 7: Rising list prices of Lantus vials and pens from 2001-2021



233.   Manufacturers' non-insulin diabetes medications have experienced similar recent price increases.

234.   Driven by these price hikes, payors' and diabetics' spending on these drugs has steadily increased with totals in the tens of billions of dollars.

### E.   Manufacturers Increased Prices in Lockstep

235.   The timing of the price increases reveals that each Manufacturer Defendant not only dramatically increased prices for the at-issue diabetes treatments, but they did so in lockstep.

236.    Between 2009 and 2015, for example, Sanofi and Novo Nordisk raised the list prices of their insulins in tandem 13 times, taking the same price increase down to the decimal point within days of each other, and sometimes within a few hours.[34]

237.    This is known as "shadow pricing," which communicates between competitors their intention not to price-compete against one another.

238.    In 2016, Novo Nordisk's and Sanofi's lockstep increases for the at-issue drugs represented the highest drug price increases in the pharmaceutical industry.

239.    Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog.  Figure 8 demonstrates this collusive behavior with respect to Lantus and Levemir.  Figure 9 demonstrates this behavior with respect to Novolog and Humalog.  (*See* Figures 8 and 9 below).

---

[34]   Charles E. Grassley & Ron Wyden, *Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, Sen. Fin. Comm., at 6, 54, 55 (Jan. 2021), https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf ("Grassley & Wyden" or "Senate Insulin Report").

Figure 8: Rising list prices of long-acting insulins



Figure 9: Rising list prices of rapid-acting insulins



240.    Figure 10 below demonstrates this behavior with respect to the human insulins –
Eli Lilly's Humulin and Novo Nordisk's Novolin.

Figure 10: Rising list price increases for human insulins



241.    Figure 11 below demonstrates Defendants' lockstep price increases for their Type 2 drugs Trulicity, Victoza, and Ozempic.

Figure 11: Rising list prices of Type 2 drugs



242.    Figure 12 below shows how, collectively, the Manufacturer Defendants have exponentially raised the prices of insulin products in near-perfect unison.

Figure 12: Lockstep insulin price increases



243.    While the list prices for all the at-issue diabetes medications have increased dramatically, the net price (*i.e.*, the price realized by the Manufacturers) has not. The primary beneficiaries of this growing disparity between list and net prices, however, have been Defendants.

244.    Because of the Manufacturer Defendants' collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

### F.    The Pharmaceutical Payment and Supply Chain

245.    The prescription drug industry is comprised of a deliberately opaque network of entities engaged in multiple distribution and payment structures.  These entities include manufacturers, wholesalers, pharmacies, payors, PBMs, and patients.

246.    Given the complexities of the different parties involved in the pharmaceutical industry, pharmaceuticals are distributed in many ways.  Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, often are distributed in one of three ways: (a) from manufacturer to wholesaler (distributor), wholesaler to pharmacy, and pharmacy to patient; or (b) from manufacturer to mail-order pharmacy to patient; and (c) from manufacturer to mail-order pharmacy, mail-order pharmacy to self-insured payor, and then self-insured payor to patient.

247.    The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain.  The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs.  The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is tied inexorably to the price set by the manufacturer.  The pricing chain includes self-insured payors like Plaintiff.

248.    However, there is no transparency in this pricing system.  Typically, only a brand drug's list price – also known as its Wholesale Acquisition Cost ("WAC") – is available.  The Average Wholesale Price ("AWP"), the price at which wholesalers sell to retailers, is typically the WAC plus 10%, but the actual price at which wholesalers sell to retailers may be subject to volume or other discounts.

249.    Manufacturers self-report the WAC or other prices upon which WAC is based to publishing compendiums such as First DataBank, who then publish those prices.

250.    As a direct result of the PBMs' conduct, the WAC persists as the most commonly and continuously used list price in reimbursement and payment calculations and negotiations for both payors and patients.

**G.      The PBMs' Role in the Pharmaceutical Payment Chain**

251.    The PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 13 below.

Figure 13: Insulin distribution and payment chain



252.    The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that the payor will pay for prescription drugs, and are paid by the payor to reimburse pharmacies for the drugs utilized by the payor's beneficiaries.

253.    The PBMs also contract with a network of retail pharmacies.  Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs.  The PBMs reimburse pharmacies for the drugs dispensed.

254.    The PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients by mail.

255.    Often – including for the at-issue drugs – the PBM Defendants purchase drugs directly from the Manufacturers and distribute them directly to the patients.

256. Even where PBM Defendant mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

257. In addition, and of particular significance here, the PBM Defendants contract with drug manufacturers, including the Manufacturer Defendants. The PBMs extract from the Manufacturers rebates, fees, and other consideration that are paid back to the PBM, including the Manufacturer Payments related to the at-issue drugs.

258. Manufacturers also interact with the PBMs related to other services outside the scope of the Illegal Pricing Scheme, such as health and educational programs and patient and prescriber outreach with respect to drugs not at-issue in this Complaint.

259. These relationships place PBMs at the center of the flow of pharmaceutical money and allow them to exert tremendous influence over what drugs are available nationwide, including in County of Macomb, on what terms, and at what prices.

260. Historically and today, PBMs:

- negotiate the price that payors pay for prescription drugs (based on prices generated by the Illegal Pricing Scheme);

- separately negotiate a different (and often lower) price that pharmacies in their networks receive for the same drug;

- set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on prices generated by the Illegal Pricing Scheme);

- set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Illegal Pricing Scheme); and

- negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Illegal Pricing Scheme).

261. Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs. This lack of

transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

262.    In every interaction that the PBMs have within the pharmaceutical pricing chain, they stand to profit from the prices generated by the Illegal Pricing Scheme.

### 1.    The Rise of the PBMs in the Pharmaceutical Supply Chain

263.    At first, in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on an ever-expanding role as participants in pharmaceutical pricing and distribution chains.

264.    One of the roles PBMs took on, as discussed above, was negotiating with drug manufacturers – ostensibly on behalf of payors.  In doing so, PBMs affirmatively represented that they were using their leverage to drive down drug prices.

265.    In the early 2000s, PBMs started buying pharmacies, thereby creating an additional incentive to collude with manufacturers to keep certain prices high.

266.    These perverse incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families.  Further recent consolidation in the industry has given PBMs disproportionate market power.

267.    Nearly 40 PBM entities combined into what are now the PBM Defendants, each of which now is affiliated with another significant player in the pharmaceutical chain, *e.g.*, Express Scripts merged with Cigna; CVS bought Caremark, which now also owns Aetna; and UnitedHealth acquired OptumRx.

268.    Figure 14 below depicts this consolidation within the PBM market.

Figure 14: PBM consolidation



269.    After merging with or acquiring all of their competitors, and now backed by multi-billion-dollar corporations, the PBM Defendants have taken over the market in the past decade, controlling more than 80% of the market and managing pharmacy benefits for more than 270 million Americans.

270.    Together, the PBM Defendants report more than $300 billion in annual revenue.

271.    The PBMs use this market consolidation and the resulting purchasing power as leverage when negotiating with other entities in the pharmaceutical pricing chain.

**2.    The Insular Nature of the Pharmaceutical Industry**

272.    The insular nature of the pharmaceutical industry has provided Defendants with ample opportunity for contact and communication with their competitors, as well as with the other

PBM Defendants and Manufacturer Defendants, in order to devise and agree to the Illegal Pricing Scheme.

273. Each Manufacturer Defendant is a member of the industry-funded Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA meetings and platforms in furtherance of the Illegal Pricing Scheme.  According to PhRMA's 2019 IRS Form 990, it received more than $515 million in "membership dues."  All members are pharmaceutical companies.[35]

274. David Ricks ("Ricks") (CEO of Eli Lilly), Paul Hudson (CEO of Sanofi), and Douglas Langa ("Langa") (President of Novo Nordisk and Executive VP of North American Operations), serve on the PhRMA Board of Directors and/or part of the PhRMA executive leadership team.

275. The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at trade associations and industry conferences.

276. Each year during the relevant period, the main PBM trade association, the industry-funded Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.[36]

277. The PCMA is governed by PBM executives. As of January 2023, the board of the PCMA included Alan Lotvin (Executive VP of PBM CVS Health and President of CVS

---

[35]  PhRMA, Return of Organization Exempt From Income Tax (Form 990) (2019), https://projects.propublica.org/nonprofits/organizations/530241211/202043189349300519/full; PhRMA, *About PhRMA*, https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/A-C/About-PhRMA2.pdf (last visited Sept. 6, 2023).

[36]  The PCMA's industry funding in the form of "membership dues" is set out in its 2019 Form 990, PCMA, Return of Organization Exempt From Income Tax (Form 990) (2019), https://projects.propublica.org/nonprofits/organizations/383676760/202042969349301134/full.

Caremark); Amy Bricker ("Bricker") (then-President of Express Scripts; now with CVS); and Cianfrocco (CEO of OptumRx). As of March 2023, the PCMA board includes PBM-affiliated members Adam Kautzner (President of Express Scripts); David Joyner (Executive VP at CVS Health) and Cianfrocco (CEO of OptumRx).

278.    All PBM Defendants are members of – and as a result of their leadership positions, have substantial control over – the PCMA.

279.    The Manufacturer Defendants are affiliate members of the PCMA.

280.    Every year, high-level representatives and corporate officers from both the PBM Defendants and the Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Illegal Pricing Scheme.

281.    In fact, for at least the last eight years, all Manufacturer Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences.

282.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications.  For example, as Presidential Sponsors of these conferences, the Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."[37]

---

[37]   PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21*, https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (an event "tailored specifically for senior executives from PBMs and their affiliated business partners" with "private reception rooms" and "interactions between PBM members, drug manufacturers, and other industry partners") (last visited Sept. 6, 2023).

283.     Representatives from each Manufacturer Defendant have routinely met privately with representatives from each PBM Defendant during the Annual Meetings and Business Forum conferences that the PCMA holds (and the Manufacturers sponsor) each year.

284.     In addition, all PCMA members, affiliates, and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[38]

285.     As PCMA members, the PBM Defendants and the Manufacturer Defendants clearly utilized both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Illegal Pricing Scheme.

286.     Notably, key at-issue lockstep price increases occurred shortly after Defendants were together at PCMA meetings.  For example, on September 26, 2017 and September 27, 2017, the PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference.  Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list price by 5.4%. Novo Nordisk also recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.

287.     Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi made its list price increase on Lantus and this occurred only a few weeks after the 2014 PCMA spring conference in Washington, D.C. attended by representatives from all the PBM Defendants.

---

[38] PCMA, *PCMA-Connect*, https://www.pcmanet.org/contact/pcma-connect/ (last visited Sept. 6, 2023).

288.     The PBMs control the PCMA and have weaponized it to further their interests and to conceal the Illegal Pricing Scheme.  The PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug pricing transparency efforts, including recently suing the Department of Health and Human Services ("HHS") to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.

289.     Notably, the PCMA's 2019 tax return reports more than a million dollars in revenue for "litigation support."  Prior tax returns available at ProPublica show millions of dollars in revenue for "litigation support" (and tens of millions in revenue for "industry relations") year after year.[39]

290.     Communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another.  For example:

- Mark Thierer worked as an executive at Caremark Rx (now CVS Caremark) prior to becoming the CEO of OptumRx in 2016 (he also served as Chairman of the Board for the PCMA starting in 2012);

- Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015 (he also served as a PCMA board member from 2015-2017 while with Aetna Rx);

- Derica Rice ("Rice") former Executive VP for CVS Health and President of CVS Caremark came previously served as Executive VP and CFO for Eli Lilly;

- Duane Barnes was the VP of Medco (now Express Scripts) before becoming division President of Aetna Rx in 2006 (he also served as a PCMA board member);

- Everett Neville was the division President of Aetna Rx before becoming Senior VP of Express Scripts;

- Albert Thigpen was a Senior VP at CVS Caremark for 11 years before becoming a Senior VP at OptumRx in 2011;

---

[39]   *See, e.g.*, PCMA 2019 Form 990, *supra* note 36, and prior years' returns on ProPublica.

- Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a VP at Aetna Rx in 2008; he served as Senior VP Member Services Operations for CVS Caremark from 2020-2022; and

- Bill Kiefer was a VP of Express Scripts for 14 years before becoming Senior VP of Strategy at OptumRx in 2013.

### H.   The Illegal Pricing Scheme

291.   PBMs possess great leverage that could be exercised to negotiate with the Manufacturer Defendants to drive ***down*** list prices for the at-issue drugs through open competition.

292.   However, contrary to the interests of their customers, the PBMs do not want the prices for diabetes medications to go down.  A 2022 report by the Community Oncology Alliance put it this way:

> Among the different sources of revenue, the most prolific by far is in the form of rebates from pharmaceutical manufacturers that PBMs extract in exchange for placing the manufacturer's product drug on a plan sponsor's formulary or encouraging utilization of the manufacturer's drugs.... [T]he growing number and scale of rebates is the primary fuel of today's high drug prices. The truth is that PBMs have a vested interest to have drug prices remain high, and to extract rebates off of these higher prices. PBM formularies tend to favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates.[40]

293.   The Manufacturer Defendants understand that PBM Defendants make more money as prices increase.  This is confirmed by the Senate Insulin Report after review of internal documents produced by the Manufacturers:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[41]

---

[40]   Community Oncology Alliance & Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers, and Taxpayers* (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf.

[41]   Grassley & Wyden, *supra* note 34.

294.    The documents eventually released by the U.S. Senate also show how the Manufacturers' pricing strategy focuses on the PBMs' profitability. In an internal August 6, 2015 email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (*i.e.*: taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . it has been costing CVS a good amount of money.[42]

295.    The Manufacturer Defendants also understand that because of the PBMs' market dominance, most payors, including in County of Macomb, accept the baseline national formularies offered by the PBMs with respect to the at-issue drugs.

296.    The Illegal Pricing Scheme was born from these understandings.  Both sets of Defendants realized that if the Manufacturers artificially inflate their list prices while paying large, undisclosed Manufacturer Payments back to the PBMs, both the PBMs and Manufacturers would generate billions of unearned dollars.  The plan worked.

297.    Over the past several years the Manufacturers have raised prices in unison and have paid correspondingly larger Manufacturer Payments to the PBMs.

298.    In exchange for the Manufacturers artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications elevated prices and preferred status on their

---

[42]   Letter from Raphael A. Prober and Steven R. Ross, Counsel for Novo Nordisk Inc., to Hon. Charles E. Grassley & Hon. Ron Wyden, Sen. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf.

national formularies.  During the relevant period, the rebate amounts (as a proportion of the list price) grew year-over-year while list prices themselves increased.

299.    Beyond increased rebate demands, the PBM Defendants also have sought and received larger and larger administrative fees from the Manufacturers during the relevant period.

300.    A recent study by the Pew Charitable Trust estimated that between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion.  The study observed that although rebates were sent to payors during this period, PBMs retained the same volume of rebates in pure dollars, given the overall growth in rebate volume while administrative fees and spread pricing (charging a client payor more for a drug than the PBM pays the pharmacy) further offset reductions in retained rebate volumes.

301.    Thus – and contrary to their public representations – the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused and continue to cause precipitous price increases for the at-issue drugs.

302.    As a result of the Illegal Pricing Scheme, every payor, including Plaintiff, that pays for and/or reimburses for the at-issue drugs has been overcharged.

303.    Moreover, the PBMs use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system.  For example, in January 2016, Express Scripts' President Tim Wentworth ("Wentworth") stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the

Express Scripts National Preferred Formulary[.]"[43]   Likewise, in April 2019, CVS Caremark President Rice stated, "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[44]

304.    In making these representations, the PBMs fail to disclose that the amount of "savings" they have generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical pricing chain and which all Defendants are directly responsible for artificially inflating.

305.    The Illegal Pricing Scheme is a coordinated effort between the Manufacturer Defendants and the PBM Defendants that each agreed to and participated in, and which created enormous profits for all of Defendants.  For example:

(a)    The Manufacturers and the PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that form and fuel the Illegal Pricing Scheme.  As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also in determining the same for competing products;

---

[43]   Surabhi Dangi-Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth*, AJMC (Jan. 12, 2016), https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth.

[44]   CVS Health, *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation, Helped Reduce Member Cost, and Improved Medication Adherence in 2018* (Apr. 11, 2019), https://www.cvshealth.com/news-and-insights/press-releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-.

(b)     The Manufacturers and the PBMs share confidential and proprietary information with each other in furtherance of the Illegal Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail-order pharmacy claims, internal medical efficacy studies, and financial data.  Defendants then use this information in coordination to set the false prices for the at-issue medications and to construct their formularies in the manner that is most profitable for both the PBM Defendants and the Manufacturer Defendants.  The data that is used to further this coordinated Illegal Pricing Scheme is compiled, analyzed, and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes OptumInsight and Optum Analytics; and

(c)     The Manufacturers and the PBMs engage in coordinated outreach programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients.  For example, the U.S. Senate Committee on Finance ("Senate Finance Committee") led by Chairman Chuck Grassley and Ron Wyden recently released an email in which Eli Lilly discussed paying UnitedHealth and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog.  The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan.[45]  I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the

---

[45]   "Pull through" is an industry term that refers to an integrated process between PBMs and Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.

full breadth of Lilly resources.  UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."

306.    Rather than using their prodigious bargaining power to lower drug prices as they claim, Defendants used their dominant positions to work together to generate billions of dollars in illicit profits at the expense of payors like Plaintiff.

**I.     Defendants Play Down the Illegal Pricing Scheme and Its Harms**

307.    On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[46]

308.    Representatives from all Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past 15 years.

309.    Further, each Defendant conceded that the price that diabetics pay out-of-pocket for insulin is too high.  For example:

- Dr. Sumit Dutta ("Dutta"), Senior VP and CMO of OptumRx since 2015, stated, "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, General Counsel for CVS Health admitted "[a] real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, prices for insulin have increased nearly 50 percent. And over the last ten years, [list] price of one product, Lantus, rose by 184 percent."

- Mike Mason ("Mason"), Senior VP of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone

---

[46]    House Committee Hearing, *"Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin"* Congress.gov (2023) https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3 (*"Priced Out of a Lifesaving Drug"*).

in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning ("Tregoning"), Executive VP External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

- Langa, Executive VP of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [list] prices of our medicines. We also know that [list] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

310.   Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.  Likewise, none of the testifying Defendants took responsibility for the price increases, as if the price increases were caused by forces outside of their respective control.

311.   Instead, Novo Nordisk's President Langa's written testimony for the April 2019 hearing recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of the WAC [list] price.  That means a pharmaceutical company fighting to remain on formulary is constrained from lowering the WAC price, or even keeping the price constant, if a competitor takes an increase.  This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others."  Likewise, Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of the list price is that there is increased pressure to keep list prices high"

312.   The hearing transcript records Langa's further comments in this regard:

So as you heard from Dr. Cefalu last week of the ADA [American Diabetes Association], there is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And *we've been participating in that system* because the higher the list price, the higher the rebate . . . There is a significant demand for rebates…. ***We're spending almost $18 billion a year in rebates***, discount, and fees, ***and we have people with insurance with diabetes that don't get the benefit of that***.  (emphasis added).

313.    Eli Lilly admitted that it raises list prices as a quid pro quo for formulary positions. At the April 2019 Congressional hearing, Mason, Senior VP of Eli Lilly testified:

Seventy-five percent of our list price is paid for rebates and discounts. . . . $210 of a vial of Humalog is paid for discounts and rebates. We have to provide rebates [to PBMs] in order to provide and compete for that [formulary position] so that people can use our insulin.

314.    In the very next question, Langa of Novo Nordisk was asked, "[H]ave you ever lowered a list price? His answer, "We have not."

315.    Sanofi's Executive VP for External Affairs, Tregoning, testified:

The rebates is [sic] how the system has evolved. I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

316.    Her written response to questions for the record acknowledged that "it is clear that payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product than for the lower list price product."

317.    The PBM Defendants also conceded at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

318.    In her responses to questions for the record, Bricker – former President of Express Scripts, a former PCMA board member, and now an executive at CVS Health – confirmed that "manufacturers lowering their list prices" would give patients "greater access to medications;" yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred

formulary status, Bricker answered, "Manufacturers do give higher discounts [*i.e.*, payments] for exclusive [formulary] position" When asked why the PBM would not include both costly and lower-priced insulin medications on its formulary, Bricker stated plainly, "We'll receive less discount in the event we do that."[47]

319.    As Dutta, Senior VP of OptumRx, perversely reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer more money to do that . . . [b]ecause the list price is not what the payer is paying.  They are paying the net price."[48]  In other words, under the Illegal Pricing Scheme, PBMs and manufacturers can make a drug with a lower list price effectively more expensive for payors and then ostensibly save payors from that artificially inflated price by giving preference to drugs that had higher list prices to begin with (yielding higher Manufacturer Payments to the PBMs).

320.    While all Defendants acknowledged before Congress their participation in conduct integral to the Illegal Pricing Scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors, like Plaintiff, and Beneficiaries were unwittingly suffering.   Instead, in an effort to obscure the true reason for precipitous price increases, each Defendant group pointed the finger at the other as the more responsible party.

---

[47]    Buried in Express Scripts' 2017 10-K is the following: "We maintain contractual relationships with numerous pharmaceutical manufacturers, which provide us with, among other things administrative fees for managing rebate programs, including the development and maintenance of formularies that include particular manufacturer's products"  That is, the Manufacturers pay the PBMs to effectively participate in the creation of formularies that payors are required to adopt as a condition for obtaining PBM services.  Express Scripts Inc., Annual Report (Form 10-K) (Dec. 31, 2017) at 24.  It also notes that its business would be "adversely affected" if it were to "lose [its] relationship with one or more key pharmaceutical manufacturers."  *Id.*

[48]    *Id.*  As noted in the hearing, even the "cheaper" alternative Admelog "costs over $200 a bottle."

321.    The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

322.    To the contrary, the amount the Manufacturers kick back to the PBM Defendants is directly correlated to an increase in list prices – on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in list price.  Reducing or eliminating Manufacturer Payments would lower prices and reduce out-of-pocket expenditures.

323.    Further, in large part because of the increased list prices and related Manufacturer Payments, the PBMs' profit per prescription has grown substantially over the same time period that insulin prices have steadily increased.  For example, since 2003 Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.[49]

324.    Novo Nordisk's President Langa submitted written testimony to Congress acknowledging "there is no doubt that the WAC [list price] is a significant component" of "what patients ultimately pay at the pharmacy counter."  Yet, the Manufacturers urged upon Congress the fiction that the PBMs were solely to blame for insulin prices because of their demands for rebates in exchange for formulary placement.  The Manufacturers claimed their hands were tied and sought to conceal their misconduct by suggesting that they have not profited from rising insulin prices.

325.    Given the Manufacturers' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices

---

[49]    David Balto, *How PBMs Make the Drug Price Problem Worse*, Hill (Aug. 31, 2016), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse.

if rebates were restricted or eliminated.  The spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would "consider it."

326.    In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that during the time insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled $122 billion.  In fact, during this time, the Manufacturers spent a significantly lower proportion of profits on R&D compared to shareholder payouts.  The paper also notes that "[t]he mean price paid by patients for insulin in the United States almost tripled between 2002 and 2013" and that "per-person spending on insulin by patients and insurance plans in the United States doubled between 2012 and 2016, despite only a marginal increase in insulin use."[50]

327.    The 2022 Community Oncology Alliance report found:[51]

[T]here are several important ways that PBM rebates increase the costs of drugs for both plan sponsors and patients PBMs employ exceedingly vague and ambiguous contractual terms to recast monies received from manufacturers outside the traditional definition of rebates, which in most cases must be shared with plan sponsors.

Rebate administration fees, *bona fide* service fees, and specialty pharmacy discounts/fees are all forms of money received by PBMs and rebate aggregators which may not be shared with (or even disclosed to) the plan sponsor. These charges serve to increase the overall costs of drugs, while providing no benefit whatsoever to plan sponsors. The total drug spend of a plan sponsor, regardless of whether it is a federal or state governmental program or a self-funded employer, will inevitably increase because PBMs are incentivized to favor expensive drugs that yield high rebates.

---

[50]   Rosie Collington, *Profits, Innovation and Financialization in the Insulin Industry*, Inst. for New Econ. Thinking (Apr. 2020), https://www.ineteconomics.org/research/research-papers/profits-innovation-and-financialization-in-the-insulin-industry.

[51]   Community Oncology Alliance, *supra* note 40.

328.     In January 2021, the Senate Finance Committee issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug"[52] that detailed Congress's findings after reviewing more than 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna. The report concluded, among other things:

- The Manufacturer Defendants retain more revenue from insulin than in the 2000s – for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade – from $1.5 billion in 2007 to $3 billion in 2018;

- The Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs; and

- The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on R&D – Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014- 2018 during which time the company generated $22.4 billion in revenue on these drugs.

329.     The truth is that, despite their finger-pointing in front of Congress, the Manufacturers and PBMs are both responsible for their concerted efforts in creating the Illegal Pricing Scheme.

**J.      All Defendants Profit from the Illegal Pricing Scheme**

330.     The Illegal Pricing Scheme affords the Manufacturer Defendants the ability to pay the PBM Defendants opaque but significant Manufacturer Payments in exchange for formulary placement, which garners the Manufacturer Defendants greater revenues from sales without decreasing their profit margins.  During the relevant period, the PBM Defendants granted national formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

---

[52]   Grassley & Wyden, *supra* note 34 at 5, 7.

331.    The Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

332.    Because of the increased list prices, and related Manufacturer Payments, the PBMs' profit per prescription has grown exponentially during the relevant period as well.  A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased more than 150% from 2014 to 2018.  In fact, for transactions in which the PBM Defendants control the PBM and the pharmacy (*e.g.*, Caremark-CVS pharmacy), these Defendants were capturing an astonishing 40% of the money spent on each insulin prescription (up from only 25% just four years earlier), even though they do not contribute to the development, manufacture, innovation, or production of the product.[53]

333.    The PBM Defendants profit from the artificially inflated prices created by the Illegal Pricing Scheme in several ways, including: (a) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments; (b) using the inflated list price to generate profits from pharmacies; and (c) relying on the inflated list price to drive up the PBMs' margins through their own mail-order pharmacies.

---

[53]   Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA Network (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932.

1.      **The PBMs Pocket a Substantial Share of Manufacturers'**
        **Secret Payments**

334.    The first way in which the PBMs profit from the Illegal Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

335.    The amount that the Manufacturers pay back to the PBMs has increased over time both in real dollars and as a proportion of the ever-increasing list prices.

336.    Historically, contracts between PBMs and payors allowed the PBMs to keep most or all of the rebates they received, rather than forwarding them to the payor.

337.    Over time, payors secured contract provisions guaranteeing payment to them of all or some portion of the rebates paid by the Manufacturers to the PBMs.  Critically, however, "rebates" are only one aspect of the total secret Manufacturer Payments, particularly as "rebates" are narrowly defined and qualified by vague exceptions in the PBM Defendants' contracts with payors.

338.    Indeed, as described in the Senate Insulin Report, the PBMs and Manufacturers coordinate to determine the contract options made available to payors: "Contracts between PBMs and manufacturers provide a menu of options from which their health plan clients can choose certain terms and conditions."[54]   The contracts between the PBMs and Manufacturers also "stipulate terms the plans must follow regarding factors such as formulary placement and competition from other drugs in the therapeutic class."[55]   Thus, the Manufacturers ultimately played a role in dictating the terms and conditions of the contracts that payors like Plaintiff entered into with PBMs.  Of course, the payors were not involved in the coordination or the negotiation of

---

[54]   Grassley & Wyden, *supra* note at 40.

[55]   *Id.* at 44.

the contracts between the PBMs and Manufacturers, and the PBMs disclosed only the fact that such relationships may exist.  But, the terms of the contracts, the consideration exchanged between the PBMs and Manufacturers, and the means of reaching these determinations all were – and remain – shrouded in secrecy.

339.    The PBM Defendants and the Manufacturer Defendants, thus, created a "hide-the-ball" system where payors like Plaintiff are not privy to rebate negotiations or contracts between the Manufacturers and the PBMs.  The consideration exchanged between them (and not shared with payors) is continually labeled and relabeled.  As more payors moved to contracts that required PBMs to remit some or all of the manufacturer "rebates" through to the payor, the PBMs rechristened Manufacturer Payments to shield them from scrutiny and from their payment obligations. Payments once called "rebates" now were termed "administrative fees," "volume discounts," "service fees," "inflation fees," or other industry monikers designed to obfuscate the substantial sums being secretly exchanged between the PBM Defendants and the Manufacturers.

340.    Just last year, the U.S. Senate Committee on Commerce, Science, and Transportation ("Senate Commerce Committee") released testimony from David Balto – a former antitrust attorney with the U.S. Department of Justice and Policy Director for the Federal Trade Commission's Bureau of Competition – from a hearing on fairness and transparency in drug pricing:

> The PBM rebate system turns competition on its head with PBMs seeking higher, not lower prices to maximize rebates and profits. In the past decade, PBM profits have increased to $28 billion annually PBMs establish tremendous roadblocks to prevent payors from knowing the amount of rebates they secure. Even sophisticated buyers are unable to secure specific drug by drug rebate information. PBMs prevent payors from being able to audit rebate information. As the Council of Economic Advisors observed, the PBM market lacks transparency as "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret." Without adequate transparency, plan sponsors cannot

determine if the PBMs are fully passing on any savings, or whether their formulary choices really benefit the plan and subscribers.

341.    The renamed, undisclosed Manufacturer Payments are substantial.  "Administrative fees" are one example.  A heavily redacted complaint filed by Express Scripts in 2017 revealed that Express Scripts retains up to 13 times more in "administrative fees" than it remits to payors in rebates.[56]

342.    These so-called administrative fees are ostensibly for coordinating ordering, invoicing, and payment among manufacturers, wholesalers, and retailers and typically are based on a percentage of the drug price, WAC or AWP, which are themselves tied together, as opposed to a flat fee.  Thus, even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which again creates (by design) a perverse incentive for the PBMs to favor higher list prices for drugs.

343.    Moreover, the PBM Defendants' contracts with payors narrowly define "rebates" by tying them to patient drug utilization.  Thus, these "administrative fees," which are not tied to patient drug utilization, are not remitted to payors.  Such payments are beyond a payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

344.    The opaque nature of these arrangements between the Manufacturer Defendants and the PBM Defendants also makes it impossible for a given payor to discover, much less assess or confront, conflicts of interest that may affect it or its members.  The Senate Insulin Report

---

[56]    *Express Scripts, Inc. v. Kaleo, Inc.*, No. 4:17-cv-01520-RLW (E.D. Mo. May 16, 2017).

observed with respect to these arrangements: "Relatively little is publicly known about these financial relationships and the impact they have on insulin costs borne by consumers."[57]

345.    Not surprisingly, the PBMs have gone to great lengths to obscure these renamed Manufacturer Payments to avoid scrutiny from payors and others.

346.    For example, as to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

347.    In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees," which are increased rebates if the Manufacturer Defendants raise their list price more than a certain percentage during the contract period.  The thresholds for these payments are typically set at around 5% to 8% – if the Manufacturer Defendants raise their prices by more than the set percentage during a specified time period, they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the list prices).

348.    This is a win-win for the Manufacturer Defendants and the PBM Defendants – they share and retain the entire benefit of these price increases while the PBM contracts with payors imply that payors are protected from price hikes by their price protection guarantees.

349.    The PBM Defendants also hide the renamed Manufacturer Payments with "rebate aggregators."  Rebate aggregators, sometimes referred to as rebate group purchasing organizations, are entities that negotiate for and collect payments from drug manufacturers, including the

---

[57]    Grassley & Wyden, *supra* note 34 at 4.

Manufacturer Defendants, on behalf of a large group of PBMs (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

350.    These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).

351.    The PBM Defendants carefully guard the revenue streams from their rebate aggregator activities, concealing them through complex contractual relationships and not reporting them separately in their quarterly SEC filings.

352.    Certain rebate-aggregator companies are located offshore, including, for example, in Switzerland (Express Scripts' Ascent Health Services) and Ireland (Emisar Pharma Services), thereby precluding adequate oversight.

353.    As summarized by the recent Community Oncology Alliance report:

> PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. Even some of the major PBMs (*i.e.*, the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates. In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (*i.e.*, contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.[58]

354.    For example, a 2017 audit conducted by a local governmental entity on OptumRx related to its PBM activities from 2013 to 2015 concluded that the auditor was unable to verify the percentage of rebates OptumRx remitted to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

---

[58]    Community Oncology Alliance, *supra* note 40.

Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.[59]

355. A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc."

356. In other words, according to this report, OptumRx contracts with its own affiliate aggregator Coalition for Advanced Pharmacy Services, who then contracts with OptumRx's co-conspirator Express Scripts, who then contracts with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then uses this complex relationship to obscure the amount of Manufacturer Payments that are being generated from its client's utilization.

357. A subsequent audit by the same local entity – covering the period September 2017 to September 2018, concluded:

Several material weaknesses in Broward's agreement with Optum were identified, many of which are commonplace across pharmacy benefit manager agreements in general. Due to contract weaknesses, a comparison of Broward's PBM agreement, including rebate amounts received, to the Consultant's marketplace data is not feasible. Broward could save an estimated $1,480,000 per year in net prescription drug benefit expenses (based upon minimum rebate guarantees) by switching from its current flawed agreement with Optum, to an agreement with its Coalition, which

---

[59] Laura Rogers & Stacey Thomas, Broward County Florida, *Audit of Pharmacy Benefit Management Services Agreement*, Office of the County Auditor: Audit Report, No. 18-13 (Dec. 7, 2017), http://web.archive.org/web/20230331163142/https://www.broward.org/Auditor/Reports/Documents/2017_1212%20Agenda%20Review%20of%20Pharmacy%20Benefit%20Management%20Services%20by%20StoneBridge/2017_1212%20Exh1_OptumRx.pdf.

offers clearly defined terms, increased rebate guarantees and cost saving requirements. [60]

Among other "loopholes" discovered in the contract were a number of "flawed" (*i.e.*, vague and manipulable) definitions – including the definition of "Rebates," which "allows the exclusion of monies that should be included – and limitation with respect to "Pass Through Transparency Pricing."[61]

358.    The January 2021 Senate Insulin Report summarizing findings of their two-year probe into the Illegal Pricing Scheme contained the following observation on these rebate aggregators:

> [T]he recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress. [62]

359.    Federal regulations governing Medicare attempt to capture all possible forms of Direct or Indirect Remuneration ("DIR") to PBMs (and plan sponsors), defining it as "any form of price concession" received by a plan sponsor or PBM "from any source," including:

> discounts, chargebacks, rebates, cash discounts, free goods contingent on a purchase agreement, up-front payments, coupons, goods in kind, free or reduced-price services, grants, legal judgment amounts, settlement amounts from lawsuits or other legal action, and other price concessions or similar benefits.  DIR also

---

[60]   Laura Rogers, Broward County, Florida, *Analysis of Broward County's Prescription Drug Coverage*, Office of the County Auditor, Report No. 19-15 (July 31, 2019) https://www.broward.org/Auditor/Reports/Reports/082019_Exh1_BCRxDrug_19-15.pdf.

[61]  *Id.*

[62]   Grassley & Wyden, *supra* note 34 at 83.

includes price concessions from and additional contingent payments to network pharmacies that cannot reasonably be determined at the point of sale.[63]

360.    The HHS Centers for Medicare & Medicaid Services ("CMS") considers all of the following as DIR: rebates, grants, reduced price administrative services, PBM-retained rebates, PBM rebate guarantee amounts, all post-point of sale payments by pharmacies that are not included in the negotiating price including dispensing incentive payments, prompt pay discounts, and payment adjustments.  On the other hand, "bona fide service fees from pharmaceutical manufacturers" and "remuneration for administrative services with no impact on the sponsor's or PBM's drug cost (*e.g.*, PBM incentive payments)" are ***not*** considered DIR ***but only to the extent they reflect fair market value for services rendered***.[64]

361.    Because the PBMs are able to retain and conceal a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Illegal Pricing Scheme.

362.    Even when payor clients receive a portion of the Manufacturer Payments from their PBM, the payors are significantly overcharged, given the extent to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

### 2.    The Illegal Pricing Scheme Allows the PBMs to Profit off Pharmacies

363.    A second way the PBM Defendants profit off the Illegal Pricing Scheme is by using the Manufacturers' inflated price to derive profit from the pharmacies with whom they contract, including those in County of Macomb.

---

[63]   Memorandum from Jennifer R. Shapiro, Director, Medicare Plan Payment Group, CMS, to All Part D Plan Sponsors, Regarding Final Medicare Part D DIR Reporting Guidance for 2021 (Mar. 30, 2022) at 7, https://www.cms.gov/files/document/final2021dirreportingreqsmemo508v3.pdf.

[64]   *Id.* at 6-7.

364.    Each PBM Defendant decides which pharmacies are included in the PBM's network and how much it will reimburse these pharmacies for each drug dispensed.

365.    The PBMs pocket the spread between the amount that the PBMs are paid by their clients for the at-issue drugs (which are based on the prices generated by the Illegal Pricing Scheme) and the amount the PBM reimburses the pharmacy (which often is less).  In other words, the PBMs charge a client like County of Macomb more for a drug than the PBM pays the pharmacy and pockets the difference.

366.    A bipartisan bill introduced in the U.S. Senate (the Pharmacy Benefit Manager Transparency Act of 2022 – S. 4293), would have criminalized spread pricing, which the bill defined as "[c]harg[ing] a health plan or payer a different amount for a prescription drug's ingredient cost or dispensing fee than the amount the PBM reimburses a pharmacy for the prescription drug's ingredient cost or dispensing fee where the pharmacy benefit manager retains the amount of any such difference."  The bill has not yet been enacted.[65]

367.    The PBMs' industry-funded trade association, PCMA, spent $7.8 million on federal lobbying in 2021 and more than $6 million through the third quarter of 2022.[66]

---

[65] *Pharmacy Benefit Manager Transparency Act of 2022*, S. 4293, 117th Cong. https://www.govtrack.us/congress/bills/117/s4293 (last visited Sept. 6, 2023).  A new PBM Transparency Act (S.127) was introduced in January 26, 2023.

[66] Open Secrets, *Client Profile: Pharmaceutical Care Management Assn* (2021), https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2021&id=D000028342; Open Secrets, *Client Profile: Pharmaceutical Care Management Assn* (2022), https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2022&id=D000028342 (2022) (last visited Sept. 6, 2023).

368.     The PBMs often disclose the concept of spread pricing to payors, but only in vague terms that require no accountability and are not subject to the payors' audit rights because the revenue is not defined as a "rebate" in PBM contracts with payors.

369.     This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors.  There is no transparency, no commitment from the PBM Defendants to take into account the cost effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

370.     The higher the Manufacturers' list prices, the more money the PBMs make off this spread.  At the same time, a Beneficiary's out-of-pocket co-pay or deductible cost often is more than if the client had simply paid cash outside of his or her plan.  On top of this, the PBM contracts generally allow no rebates to payors where the Beneficiary is responsible for 100% of the drug cost, *e.g.*, under his or her deductible.

371.     The PBM Defendants also use the Illegal Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR fees, based on the list prices – and again, the higher the list price for each diabetes medication sold, the more fees the PBMs generate.  They also apply "retrospective" discounts so, for example, a payor's (and member's co-pay or deductible) cost may be $100, but the price may be discounted post-purchase between the PBM and the (often self-owned) pharmacy to $90, with the spread going to the PBM.

372.     The CMS addressed these and similar DIR issues in a proposed rule in 2017.  While noting the growth of "pharmacy price concessions" that "are negotiated between pharmacies and their sponsors or PBMs," the CMS nevertheless concluded:

> When manufacturer rebates and pharmacy price concessions are not reflected in the price of a drug at the point of sale, beneficiaries might see lower premiums, but they do not benefit through a reduction in the amount they must pay in cost-sharing, and thus, end up paying a larger share of the actual cost of a drug. Moreover, given

> the increase in manufacturer rebates and pharmacy price concessions in recent years, the point-of-sale price of a drug that a Part D sponsor reports on a PDE record as the negotiated price is rendered less transparent . . . . [67]

CMS expressed further concern that when rebates and other price concessions are not reflected in the negotiated point-of-sale drug price, it "can impede beneficiary access to necessary medications, which leads to poorer health outcomes and higher medical care costs for beneficiaries…[68]

373.    The PBM Defendants, thus, make money "coming and going."  In a pre-PBM world, a competitively priced drug might have a (hypothetical) net cost to a health plan of $50, and that is what it paid.  PBMs enter the picture and coordinate with Manufacturers to increase the list price to $150.  The PBMs then "negotiate" the inflated price down to $100 and take a $50 rebate, some of which may be forwarded to the payor, whose net cost is less than the inflated list price, but whose real-world cost is considerably more than if the PBMs were not involved.  At the same time, the PBM receives "administrative fees" for including certain drugs on its formularies, which are not considered "rebates."  The PBM also receives "service fees" or other payment for "administrative services" provided to the Manufacturers such as "formulary compliance initiatives," "education services," or the sale of non-patient identifiable claim information.  All of these revenue streams are outside the definition of "rebates."  The PBM then charges payors administrative fees for providing pharmacy benefit management services and charges drug costs

---

[67] *Medicare Program; Contract Year 2019 Policy and Technical Changes to the Medicare Advantage, Medicare Costs Pl Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs, and the PACE Program*, 82 Fed. Reg. 56336 (Nov. 28, 2017) (to be codified 42 C.F.R. pts. 405, 417, 422, 423, and 498), https://www.govinfo.gov/content/pkg/FR-2017-11-28/pdf/2017-25068.pdf.

[68] *Id.*

(a/k/a ingredient costs) and per-prescription dispensing fees, as well as additional administrative fees for services not included in the PBM's general administrative obligations.  The PBM then receives rebates and/or discounts (pre-purchase or post-purchase) from the pharmacies, which the PBM often owns.  These, too, are excluded from the definition of "rebates."  These and other vaguely described revenue streams are sometimes disclosed, but only in hazy, general terms.  They are beyond a payor's contractual rights to audit for "transparency" purposes because they are not defined "rebates."  Additionally, the PBM may take months to pay rebates to payors and the PBM retains all interest on, and the time-value of, the rebates pending payment.  This is one example of a PBM "disclosure" excerpted from Plaintiff's PBM contract with Express Scripts:

> This disclosure provides an ***overview*** of the ***principal*** revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. ***Some*** of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI ***may*** pass through certain manufacturer payments to its clients or ***may*** retain those payments for itself, depending on the contract terms between ESI and the client Formulary rebate amounts vary based on the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to ***various*** formulary management controls, benefit design requirements, claims volume, and ***other similar factors***, and ***in certain instances*** also ***may*** vary based on the product's market-share. ESI ***often*** pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI retains the financial benefit of the use of any funds held until payment of formulary rebate amounts is made to the client. In addition, ESI provides administrative services to formulary rebate contracted manufacturers, which include, ***for example***, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. (emphasis added). Payors have no access to, and no knowledge of, the intricacies of the dealings between the PBM Defendants and the Manufacturers that are shrouded by such vague "disclosures" (which vary in detail, but not in substance, in all three of the PBM Defendants' adhesive contracts). These disclosures could

be summed up in a single sentence: "We pass along 'rebates' to client payors, except when we don't."

### 3.     The Illegal Pricing Scheme Increases PBM Mail-Order Profits

374.     Another way the PBM Defendants profit from the Illegal Pricing Scheme is through their mail-order pharmacies.  The higher the price that the PBM Defendants are able to get customers, such as Plaintiff, to pay for diabetes medications, the higher the profits the PBM Defendants realize through their mail-order pharmacies.

375.     Because the PBMs base the price they charge for the at-issue diabetes medications on the Manufacturers' price, the more the Manufacturers inflate their prices, the more money the PBMs make.  For example, the PBMs have colluded with the Manufacturers so that the PBMs often know when the Manufacturers are going to raise their prices.  The PBMs use this opportunity to purchase a significant amount of the at-issue drugs prior to the price increase, at the lower rate. Then, after the Manufacturers raise their price, the PBMs charge their mail-order customers based on the higher, increased prices and pocket the difference.  The PBMs make significant amounts of money on this Illegal Pricing Scheme.

376.     The PBM Defendants also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the Manufacturers' price.  Once again, the higher the price is, the more money the PBMs make on these fees.

377.     In sum, every way in which the PBMs make money on diabetes medications is tied directly to creating higher prices and inducing larger secret Manufacturer Payments.  The PBMs are not lowering the price of diabetes medications as they publicly represent – they are making billions of dollars by fueling these skyrocketing prices.

### K.     Plaintiff Purchased or Reimbursed for At-Issue Drugs from Defendants

378.    As a government employer, Plaintiff serves its residents by providing public safety, emergency management, and health services, to name just a few of its vital roles.  As more federal and state responsibilities are passed on to local governments, Plaintiff has a growing list of obligations with a limited budget.  Consequently, any significant increase in spending can have a severe detrimental effect on Plaintiff's overall budget and, in turn, negatively impact its ability to provide essential services to the community.

379.    One of the benefits Plaintiff provides its Beneficiaries is paying for a large portion of their pharmaceutical purchases.  In this role, Plaintiff spent significant amounts on the at-issue diabetes medications during the relevant period.  Plaintiff maintains a self-funded plan for its active employees and retirees for its health benefits and prescription drugs.  To administer these benefits, Plaintiff, must retain a PBM (and their affiliated pharmacies) for pharmaceutical benefits and prescription drugs, including the at-issue medications.  Plaintiff is the only named party that pays the full purchase price for the at-issue drugs, and the only named party that has not knowingly participated in the Illegal Pricing Scheme.  Neither the PBM Defendants nor the Manufacturer Defendants suffer losses from the Illegal Pricing Scheme.  As part of purchasing or reimbursing for the at-issue drugs, Plaintiff pays the PBMs artificially inflated costs resulting from the Illegal Pricing Scheme, including "administrative fees," "inflation fees," "discounts," and more.  Because the at-issue drugs are lifesaving, and because Defendants control the market for these drugs, Plaintiff has no choice but to pay these exorbitant, artificially inflated prices.

380.    To administer its health plans' pharmaceutical program, Plaintiff relies on the PBMs as administrative agents, for the supposed purposes of limiting its administrative burden and controlling pharmaceutical drug costs.

381.    At different times during the relevant period, Plaintiff relied on both Express Scripts and OptumRx for the administration of pharmaceutical benefits to its Beneficiaries.  These PBM services included developing and offering formularies for Plaintiff's prescription plan, constructing and managing Plaintiff's pharmacy network (which included the PBMs' retail and mail-order pharmacies), processing pharmacy claims, and providing mail-order pharmacy services to Plaintiff.

382.    In providing these services, Express Scripts and OptumRx – in direct coordination with the Manufacturer Defendants and utilizing the false prices generated by the Illegal Pricing Scheme – determined the amounts Plaintiff paid for the at-issue medications.

**L.    Defendants Deceived Plaintiff**

383.    At no time has either Defendant group disclosed the Illegal Pricing Scheme or the false list prices produced by it.

**1.    The Manufacturer Defendants Deceived Plaintiff**

384.    At all times during the relevant period, the Manufacturer Defendants knew that the list prices, net prices, and payors' net costs (purchase prices) generated by the Illegal Pricing Scheme were false, excessive, and untethered to any legal, competitive, or fair market price.

385.    The Manufacturer Defendants knew that these prices did not bear a reasonable relationship to the actual costs incurred or prices realized by Defendants, did not result from transparent or competitive market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

386.    Defendants' business arrangement around insulin medications exhibits the key features of oligopolies (see Figure 14) – concentration of numerous competitors into a small group

of firms that dominates the market, high barriers to new entry, ability to set and control prices, firm interdependence, and maximal revenues.

387.     The Manufacturer Defendants also knew that payors, including Plaintiff, relied on the false list prices vertically imposed by the Illegal Pricing Scheme to pay for the at-issue drugs.

388.     The Manufacturer Defendants and the PBM Defendants further knew that Plaintiff – like any reasonable consumer – wanted and expected to pay a price reflecting the lowest fair market value for the drugs (which was not necessarily the same as the lowest price in the market, given that all prices were inflated due to the Illegal Pricing Scheme).

389.     Despite this knowledge, the Manufacturer Defendants published list prices vertically imposed by the Illegal Pricing Scheme throughout the United States, including in Michigan, through publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain, and directly to pharmacies, who then used these prices to set the amount that the pharmacies charged for the at-issue drugs.

390.     The Manufacturer Defendants also published these prices to the PBMs, who then used them to charge diabetics and payors, like Plaintiff, for the at-issue drugs.

391.     By publishing their prices throughout Michigan, the Manufacturer Defendants held each of these prices out as a reasonable price on which to base the prices payors pay for the at-issue drugs.

392.     These representations are false.  The Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to their cost, their fair market value in a competitive market, or the net price received for the at-issue drugs.

393.     During the relevant period, the Manufacturer Defendants published prices in Michigan in the hundreds of dollars per dose for the same at-issue drugs that would have been profitable at less than $10 per dose.

394.     The Manufacturer Defendants also have publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation.  For example, briefing materials prepared for CEO Ricks as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant R&D costs for insulin.  During the relevant period, executives from Sanofi and Novo Nordisk also falsely represented that R&D costs were key factors driving the at-issue price increases.[69]

395.     To the contrary, between 2005 and 2018, Eli Lilly spent $680 million on R&D costs related to Humalog while earning $31.35 billion in *net* sales during that same time period.  In other words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant period, *i.e.*, R&D costs amounted to about 2% of *net* sales (whereas R&D costs for pharmaceuticals typically amount to around 20% of *total* revenues).  Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.[70]

396.     The Senate Insulin Report found that the PBMs consider insulins to be "interchangeable" from "a clinical perspective" and that Manufacturers "focus their R&D efforts

---

[69]   U.S. House of Reps., *Drug Pricing Investigation*: *Majority Staff Report*, H.R. Comm. on Oversight and Reform, 117th Cong. (Dec. 2021), https://web.archive.org/web/20211215170722/https://oversight.house.gov/sites/democrats.oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf.

[70]   *Id.*

on new insulin-related devices, equipment, and other mechanical parts that are separate from insulin's formulation."[71]

397.     A House Oversight Committee staff report concluded that "drug companies' claims that reducing U.S. prescription drug prices will harm innovation is overblown" and that "[m]any drug companies spent a significant portion of their R&D budget on finding ways to suppress generic and biosimilar competition while continuing to raise prices, rather than on innovative research."[72]

398.     In sum, the Manufacturer Defendants affirmatively withheld the truth from Plaintiff and specifically made misrepresentations in furtherance of the Illegal Pricing Scheme and to induce Plaintiff's reliance to purchase the at-issue drugs.

### 2.       The PBM Defendants Deceived Plaintiff

399.     The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by selecting high-priced at-issue drugs for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

400.     The PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs.  This lack of transparency affords Defendants the opportunity to construct and

---

[71]   Grassley & Wyden, *supra* note 34 at 5, 17

[72]   U.S. House of Reps., *Drug Pricing Investigation: Industry Spending on Buybacks, Dividends and Executive Compensation*, H.R. Comm. on Oversight and Reform, 117th Cong. (July 2021), https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/COR%20Staff%20Report%20%20Pharmaceutical%20Industry%20Buybacks%20Dividends%20Compared%20to%20Research.pdf).

perpetuate the Illegal Pricing Scheme, and to profit therefrom at the expense of Michigan payors, including Plaintiff.

401.    At all times throughout the relevant period, the PBMs have purposefully, consistently, and routinely misrepresented that they negotiate with the Manufacturer Defendants and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics. Representative examples include[73]"

- CVS Caremark has for the past decade consistently stated in its annual reports that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness, and convenience of prescription drugs. CVS Caremark has further stated that it maintains an independent panel of doctors, pharmacists and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

- Likewise, Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists, and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain, and to improve members' health outcomes. Its annual reports consistently claim that in making formulary recommendations, Express Scripts' Pharmacy & Therapeutics Committee considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the Pharmacy & Therapeutics Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy.

- Similarly, OptumRx has consistently stated in its annual reports over the past decade that OptumRx's rebate contracting and formulary management assist customers in achieving a low-cost, high-quality pharmacy benefit. It has consistently claimed that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on their safety, cost, and effectiveness.

---

[73]  CVS Health Corp., Annual Reports (Form 10-K) (FY 2010-2019); OptumRx, Annual Reports (Form 10-K) (FY 2010-2019); Express Scripts Inc., Annual Reports (Form 10-K) (FY 2010-2019).

402.    In addition to these general misrepresentations, the PBM Defendants have during the relevant period purposefully, consistently, and routinely made misrepresentations about the at-issue diabetes medications. Representative examples include:

- In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[74]

- In 2010, Dr. Andrew Sussman, Associate CMO of CVS Caremark, stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."[75]

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[76]

- In 2016, Glen Stettin ("Stettin"), Senior VP and Chief Innovation Officer at Express Scripts, said in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."[77] Stettin also claimed that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[78]

---

[74]   Chain Drug Review, *CVS Expands Extracare for Diabetes Products* (May 11, 2010), https://www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/.

[75]   CBS News, Diabetes Epidemic Growing (June 22, 2010), https://www.cbsnews.com/news/diabetes-epidemic-growing/.

[76]   Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, Wall St. J. (Nov. 8, 2012), https://www.wsj.com/articles/SB10001424127887324439804578107040729812454.

[77]   Angela Mueller, *Express Scripts launches program to control diabetes costs*, St. Louis Bus. J. (Aug. 31, 2016), https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html.

[78]   Michael Johnsen, *Express Scripts implements latest Diabetes Care Value Program*, Drug Store News (Aug. 30, 2016), https://drugstorenews.com/pharmacy/express-scripts-implements-latest-diabetes-care-value-program.

- In a 2018 Healthline interview, Mark Merritt, long time President of the PBM trade association, PCMA, misrepresented that: Through their formulary construction, PBMs are putting pressure on drug companies to reduce insulin prices.[79]

- CVS Caremark's Chief Policy and External Affairs Officer claimed in the April 2019 hearings that CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."[80]

- Dutta, Senior VP and CMO of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."[81]

- The PBM-funded trade association PCMA's website acknowledges, "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins," but then misleadingly claims that "PBMs work hard to drive down costs using formulary management and rebates."[82]

403.    The PBM Defendants not only falsely represent that they negotiate with the Manufacturer Defendants to lower the price of the at-issue diabetes medications for **payors**, but also for diabetic **patients** as well.  Representative examples include:

- Express Scripts' code of conduct, effective beginning in 2015, states: "At Express Scripts we're dedicated to keeping our promises to **patients and clients** . . . This commitment defines our culture, and all our collective efforts are focused on our

---

[79]  Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?*, Population Health Learning Network (Dec. 2016), https://www.hmpgloballearningnetwork.com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part.

[80]  *Priced Out of a Lifesaving Drug*, *supra* note 46.

[81]  *Id.*

[82]  PCMA, *PCMA on National Diabetes Month: PBMs Lowering Insulin Costs, Providing Support to Patients* (Nov. 16, 2020), https://www.pcmanet.org/pcma-on-national-diabetes-month-pbms-lowering-insulin-costs-providing-support-to-patients/; Visante, *Insulins: Managing Costs with Increasing Manufacturer Prices* (2020), https://www. pcmanet.org/ wp-content/uploads/2020/08/PCMA_Visante-Insulins-Prices-and-Costs-.pdf.

mission to make the use of prescription drugs safer and more affordable."[83] (emphasis added).

- Bricker – former President of Express Scripts and PCMA board member; now an executive with CVS Health – testified before Congress in April 2019: "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs."[84] (emphasis added).

- Bricker also testified that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications."[85] (emphasis added).

- OptumRx CEO John Prince ("Prince") testified to the U.S. Senate: "We *reduce the costs of prescription drugs* [and] we are leading the way to ensure that *those discounts directly benefit consumers* OptumRx's pharmacy care services business is *achieving better health outcomes for patients*, *lowering costs* for the system, and *improving the healthcare experience for consumers*. . . .OptumRx negotiates better prices with drug manufacturers *for our customers and for consumers*."[86] (emphasis added).

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative."[87] (emphasis added).

- The PCMA website touts PBMs as "the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs" and (contradicting the PBM

---

[83] Express Scripts, *Code of Conduct*, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Sept. 6, 2023).

[84] *Priced Out of a Lifesaving Drug*, *supra* note 46.

[85] *Id.*

[86] *Drug Pricing in America: a Prescription for Change, Part II*, Hearing Before the Committee on Finance, U.S. Senate, 116th Cong. (Apr. 9, 2019) at 174, https://www.finance.senate.gov/imo/media/doc/435631.pdf.

[87] CVS Health, *2017 Drug Trend Report* (Apr. 5, 2018), https://payorsolutions.cvshealth.com/insights/2017-drug-trend-report.

representatives' Congressional testimony), that "when new manufacturers enter the market at a lower list price, PBMs use the competition to drive costs down."[88]

404.   Not only have the PBM Defendants intentionally misrepresented that they use their market power to save payors money, but they have specifically and falsely disavowed that their conduct drives prices higher. Representative examples include:

- On an Express Scripts' earnings call in February 2017, CEO Wentworth stated, "Drugmakers set prices, and we exist to bring those prices down."[89]

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[90]

- In 2017, Express Scripts' CEO Wentworth went on *CBS News* to argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[91]

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's CMO Dutta answered, "we can't see a correlation when rebates raise list prices."[92]

[88]   PCMA, *PBMs Reduce Insulin Costs: PBMs are working to improve the lives of patients living with diabetes and their families*, https://www.pcmanet.org/insulin-managing-costs-with-increasing-manufacturer-prices/ (last visited Sept. 6, 2023).

[89]   Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation'*, St. Louis Post-Dispatch (Feb. 17, 2017), https://www.stltoday.com/business/local/express-scripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html.

[90]   Lynn R. Webster, *Who Is to Blame for Skyrocketing Drug Prices?*, Hill (July 27, 2017), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices.

[91]   CBS News, *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/.

[92]   *Priced Out of a Lifesaving Drug*,  note 46.

- In 2019, when testifying Congress on the rising price of insulins, Bricker – then with Express Scripts, now with CVS – testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."[93]

405.    All of the PBM Defendants' public statements regarding insulin pricing have been consistent with the misrepresentations above (and those detailed below).  None have contradicted those misrepresentations and none have revealed the Illegal Pricing Scheme.

406.    The misrepresentations detailed above (or all of those detailed below), and all public pronouncements by Defendants were consistent with those misrepresentations.

407.    Plaintiff's interactions with the PBM Defendants were consistent with those misrepresentations, which were made in furtherance of, and in order to conceal, the Illegal Pricing Scheme.

408.    While bombarding Plaintiff and the public with misrepresentations and half-truths like those above, none of the PBMs revealed the details of their relationships with the Manufacturer Defendants or the existence of the Illegal Pricing Scheme.

409.    Throughout the relevant period, the PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with their payor clients; (b) they work to lower the price of the at-issue drugs and, in doing so, achieve substantial savings for diabetics and payors; and (c) that monies they receive from manufacturers and their formulary choices are for the benefit of payors and diabetics.

410.    The PBM Defendants understand that payors like Plaintiff rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve access to medications.  Plaintiff did so.

---

[93]    *Id.*

411.     Throughout the relevant period, the PBM Defendants also falsely claimed they are transparent about the Manufacturer Payments and that the amounts remit (or not) to payors.   In fact, the PBM Defendants' disclosures of their ties to the Manufacturer Defendants were vague and equivocal.   Their manner of defining "rebates" in payor contracts was illusory and subject to indeterminate conditions and exceptions.   The PBM Defendants thereby facilitated and obtained secret Manufacturer Payments far above and beyond the amount of "rebates" remitted to payors.

412.     The PBM Defendants' internal processes and accounting were and are abstruse and opaque, allowing them to overtly mislead the public and payors like Plaintiff.

413.     In 2011, for example, OptumRx's President stated, "We want our clients to fully understand our pricing structure . . . [e]very day we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."[94]

414.     In a 2017 *CBS News* interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments they receive and that payors "know exactly how the dollars flow" with respect to these Manufacturer Payments.[95]

415.     When testifying before the Senate Finance Committee, CVS Executive VP Rice stated, "[A]s it pertains to transparency overall, we at CVS Caremark are very supportive.   We

---

[94]   UnitedHealth Group, *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards* (Sept. 13, 2011), https://web.archive.org/web/20210805182422/https://www.unitedhealthgroup.com/newsroom/2011/0913tipps.html (last visited Sept. 6, 2023).   *Also see, e.g.*, published version of press release at https://www.businesswire.com/news/home/20110913006224/en/Prescription-Solutions-by-OptumRx-Receives-4th-Consecutive-TIPPSSM-Certification-for-Pharmacy-Benefits-Transparency-Standards (last visited Sept. 6, 2023).

[95]   CBS News, *supra* note 89.

provide full visibility to our clients of all our contracts and the discounts that we negotiate on their behalf[.]  And transparency – today we report and fully disclose not only to our clients, but to CMS [Medicare]."[96]

416.    Testifying at the same hearing, Steve Miller of Cigna (Express Scripts) claimed "we are a really strong proponent for transparency for those who pay for health care. So the patient should know exactly what they are going to pay.  Our plan sponsors should know exactly what is in their contract."[97]

417.    Prince of OptumRx chimed in, "Senator, if our discounts were publicly available, it would hurt our ability to negotiate effectively.  Our discounts are transparent to our clients."[98]

418.    When testifying before Congress in April 2019, Bricker, then a Senior VP of Express Scripts, touted transparency with payors and echoed Prince's need for confidentiality around discounts:[99]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. The reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> *       *       *
>
> Mr. Sarbanes. Yeah, because it's a secret. What about if we made it completely transparent? Who would be for that?
>
> *       *       *

---

[96]   *Drug Pricing in America*, s*upra* note 84 at 28, 32.

[97]   *Id.* at 32.

[98]   *Id.*

[99]   *Priced Out of a Lifesaving Drug*, *supra* note 46.

Ms. Bricker. Absolutely not . . . [i]t will hurt the consumer. . . . prices will be held high.

419.    As recently as May 2022, JC Scott ("Scott") – President of PCMA – testified as follows before the Senate Commerce Committee:

PBMs are proud of the work they do to reduce prescription drug costs, expand affordable access to medications, and improve patient outcomes. PBMs negotiate with drug companies to lower prescription drug costs PBMs advocate for patients in the fight to keep prescription drugs accessible and affordable.

Mirroring the PCMA website, Scott also testified, "The PBM industry is the only stakeholder in the chain dedicated to seeking lower costs."

420.    During the relevant period – as seen above – the PBM Defendants represented to the public, including Plaintiff, that they constructed formularies and negotiated with the Manufacturer Defendants for the benefit of payors and patients to maximize drug cost savings while promoting the health of diabetics.

421.    Throughout the relevant period, the PBMs consistently made similar misrepresentations to Michigan payors, including County of Macomb, through bid proposals, member communications, invoices, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

422.    These representations were false – the Manufacturer Defendants and the PBM Defendants, in fact, coordinated to publish the false prices and to construct the PBM formularies, causing the price of the at-issue drugs to skyrocket.  For example:

- In 2018, the United States spent $28 billion (USD) on insulin compared with $484 million in Canada. The average American insulin user spent $3490 on insulin in 2018 compared with $725 among Canadians.

- Diabetics who receive their medications from federal programs that do not utilize PBMs also pay significantly less. In December 2020, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report finding that federal health care programs that negotiate directly with the Manufacturers (such as the Department of Veterans Affairs) and,

thus, are outside the PBM Defendants' Illegal Pricing Scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program, which relies on the PBM Defendants to set their at-issue drug prices.

423.     Defendants knew their representations were false when they made them and coordinated to affirmatively withhold the truth from payors, including Plaintiff.

424.     Defendants concealed the falsity of their representations by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

425.     Defendants have never revealed the full amount of any drug-specific Manufacturer Payments exchanged between them.  Despite the claims of transparency to Plaintiff and to the public and despite Plaintiff's contractual relationship with OptumRx and Express Scripts, Plaintiff does not know, and cannot learn, of the full extent of the Manufacturer Payments and other agreements between PBMs and the Manufacturer Defendants.

426.     The PBM Defendants do not disclose the terms of the agreements they make with the Manufacturers or the Manufacturer Payments they receive.  Likewise, they do not disclose the details related to their agreements (formal or otherwise) with pharmacies.  All of these revenue streams are beyond the scope of the payors' contractual audit rights.

427.     Further, although PBMs negotiate drug-specific rebates with Manufacturers,[100] the PBM rebate payments to payor clients and summaries of such payments are in the aggregate, rather than on a drug-by-drug basis.  It is impossible for payors like Plaintiff to tease out drug-specific rebates, much less the other undisclosed Manufacturer Payments.  This allowed the PBM

---

[100]  Grassley & Wyden, *supra* note 5 at 40.

Defendants to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

428.    The PBM Defendants have gone so far as to sue governmental entities to block the release of details on their pricing agreements with the Manufacturers and pharmacies.

429.    Even when audited by payors, the PBM Defendants routinely refuse to disclose their agreements with the Manufacturers and pharmacies by relying on overly broad confidential agreements and claims of trade secrets and by erecting other unnecessary roadblocks and restrictions.

430.    Beneficiaries of Plaintiff's health plans have no choice but to pay prices flowing from Defendants' inflated list prices because Beneficiaries need these medications to survive and the Manufacturer Defendants make virtually all diabetes medications available in the United States.  The list prices generated by Defendants' coordinated efforts directly impact out-of-pocket costs at the point of sale.

431.    In sum, the entire insulin pricing structure created by Defendants – from the false prices to the Manufacturers' misrepresentations related to the reasons behind the prices, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics – is unconscionable, deceptive, and immensely lucrative.

432.    Plaintiff did not know, because Defendants affirmatively concealed: (a) that the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration; (b) that the list prices were falsely inflated; (c) that the list prices were manipulated to satisfy PBM profit demands; (d) that the list prices and net costs (purchase prices) paid by Plaintiff bore no relationship to the fair market value of the drugs themselves or the

services rendered by the PBMs in coordinating their pricinIor (e) that the entire insulin pricing structure Defendants created was false.

### M.  The Illegal Pricing Scheme Has Damaged Plaintiff

433.   Plaintiff provides health and pharmacy benefits to its Beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period.

434.   One of the benefits that Plaintiff offers its Beneficiaries through its employee health plans is payment of a significant portion of the Beneficiaries' prescription drug purchases.

435.   Plaintiff has for years interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications.

436.   Plaintiff was unaware of the Illegal Pricing Scheme and relied on Defendants' statements and material omissions made in furtherance of the Illegal Pricing Scheme.

437.   Plaintiff relied on Defendants' misrepresentations in paying for the at-issue diabetes medications at prices that would have been lower but for the Illegal Pricing Scheme.

438.   Since 2013, County of Macomb has spent millions of dollars on the at-issue diabetes medications.

439.   Defendants' misrepresentations, omissions, and misconduct – including and as manifested in the Illegal Pricing Scheme – directly and proximately caused economic damage to Plaintiff as a payor/purchaser of Defendants' at-issue diabetes medications.

440.   A substantial proportion of the money Plaintiff spent on diabetes medications is attributable to Defendants' inflated prices, which did not arise from competitive market forces but, instead, are directly attributable to the Illegal Pricing Scheme.

441.    Because of Defendants' success in concealing the Illegal Pricing Scheme through act and omission, no payor, including Plaintiff, knew, should have known, or could have known during the relevant period that the prices for the at-issue diabetes medications were (and remain) artificially inflated due to Defendants' Illegal Pricing Scheme.

442.    As a result, despite receiving some rebates and incurring drug costs based on discounts off list prices, Plaintiff has unknowingly overpaid for the Manufacturer Defendants' diabetes medications, which would have cost less but for the Illegal Pricing Scheme.

443.    In short, the Illegal Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay for diabetes medications.

444.    Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Illegal Pricing Scheme, the harm to Plaintiff is ongoing.

**N.    Defendants' Recent Efforts in Response to Rising Insulin Prices**

445.    In reaction to mounting political and public outcry, Defendants have taken action both on Capitol Hill and in the public relations space.

446.    First, in response to public criticism, Defendants have increased their spending to spread their influence in Washington D.C.

447.    For example, in recent years Novo Nordisk's political action committee ("PAC") has doubled its spending on federal campaign donations and lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its biggest ever investment in directly influencing U.S. policymakers. Eli Lilly and Sanofi also have contributed millions of dollars through their PACs in recent years.

448.    Second, Defendants have recently begun publicizing programs ostensibly aimed at lowering the cost of insulins.

449.    These affordability measures fail to address the structural issues that caused the price hikes.  Rather, these are public relations measures that do not solve the problem.

450.    For example, in March 2019, Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

451.    However, in the months after Eli Lilly's announcement, reports raised questions about the availability of Insulin Lispro in local pharmacies.

452.    Following this, the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug.  The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.[101]

453.    Eli Lilly did lower the price of Lispro by 40% effective January 1, 2022, but it is not included in any of the PBM Defendants' formularies as of January 2023.

454.    In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart.  However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling.  In particular, for many diabetics, especially Type 1 diabetics, these

---

[101]    Sen. Elizabeth Warren & Sen. Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, (Dec. 2019), https://www.warren.senate.gov/imo/media/doc/Inaccessible%20Insulin%20report.pdf.

insulins can be dangerous.  In any event, ReliOn is not included in any of the PBM Defendants' formularies as of January 2023.

455.    Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem and the PBMs continue to exclude drugs with lower list prices despite their assurances of cost-savings for payors and Beneficiaries.

456.    Likewise, the FDA in 2020 approved the biosimilar Insulin Glargine-yfgn (branded as Semglee), which is manufactured and sold by newcomers to the market – Viatris and Biocon Biologics.  Insulin Glargine-yfgn (Semglee) is interchangeable with Sanofi's Lantus product, and, according to Viatris, its list price is three times less than Lantus.  However, it is not included in any of the PBM Defendants' formularies as of January 2023.

457.    Lastly, and most recently, the Manufacturer Defendants have announced that they will reduce the prices of certain insulin and insulin-analog medications with the Price Cuts set to take effect in mid-to late 2023 and 2024.  As explained above, however, these Price Cuts are insufficient and will not mitigate Plaintiff's past damages or prevent further losses moving forward.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

458.    Plaintiff has diligently pursued and investigated the claims asserted in this Complaint.  Through no fault of its own, Plaintiff did not learn, and could not have learned, the factual bases for its claims or the injuries suffered therefrom until recently.  Consequently, the following tolling doctrines apply.

### A.     Discovery Rule

459.    Plaintiff did not know about the Illegal Pricing Scheme until shortly before filing this Complaint.  Plaintiff was unaware that it was economically injured and unaware that any

economic injury was wrongfully caused, nor did Plaintiff possess sufficient information concerning the injury complained of here, or its cause, to put Plaintiff or any reasonable person on inquiry notice to determine whether actionable conduct was involved.

460.    The PBM Defendants and the Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants or the details of Defendants' negotiations and payments between each other or their pricing structures and agreements – Defendants labeled these trade secrets, shrouded them in confidentiality agreements, and circumscribed payor audit rights to protect them.

461.    Each Defendant group also affirmatively blamed the other for the price increases described herein, both during their Congressional testimonies and through the media.   All disavowed wrongdoing and falsely claimed that their dealings with payors like Plaintiff were honest and transparent.

462.    Plaintiff did not discover until shortly before filing this Complaint facts sufficient to cause a reasonable person to suspect that Defendants were engaged in the Illegal Pricing Scheme or that Plaintiff had suffered economic injury as a result of any or all Defendants' wrongdoing, nor would diligent inquiry have disclosed the true facts had Plaintiff been aware of any cause to undertake such an inquiry.

463.    Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants, *i.e.*, the Illegal Pricing Scheme, continue to obscure Defendants' unlawful conduct from Plaintiff and the general public.

B.      **Fraudulent Concealment**

464.    Through the acts, omissions, and representations alleged throughout this Complaint, Defendants fraudulently concealed the fact of Plaintiff's economic injury and its cause.

465.    Defendants' acts, omissions, and representations were calculated to lull and induce payors, including Plaintiff, into forbearing legal action or any inquiry that might lead to legal action.  Defendants' acts, omissions, and representations were intended to, and in fact did, prevent Plaintiff from discovering its claim.

466.    Accordingly, all applicable statutes of limitation have been tolled.

C.      **Equitable Estoppel**

467.    Defendants were under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided – all of which would be and are now material to Plaintiff.

468.    Instead of disclosing these facts, Defendants knowingly misrepresented and concealed them with a reasonable expectation that Plaintiff would act upon the misrepresentations and omissions.

469.    Being unaware of the true facts, being unaware of the economic harm it was suffering, and having no cause to inquire further, Plaintiff did, indeed, rely in good faith to its detriment on Defendants' misrepresentations and omissions.

470.    In short, through Defendants' acts, omissions, and representations as alleged throughout this Complaint, Defendants knowingly misrepresented and concealed material facts with the expectation that Plaintiff would act upon them, which Plaintiff did in good faith and to its detriment.

471.    Accordingly, Defendants are equitably estopped from relying on any statutes of limitations in defense of this action.

**D.    Continuing Violations**

472.    The acts, omissions, and misrepresentations alleged throughout this Complaint have continued to the present day.  Defendants' systematic misconduct constitutes a continuous, unbroken violation of the law that has caused, and continues to cause, continuous economic harm to Plaintiff.

473.    Accordingly, all applicable statutes of limitations are tolled.

**VI.    CLAIMS FOR RELIEF**

**COUNT I**

**Violations of the Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. §1962(c)**

474.    Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

475.    Defendants are (a) culpable "persons" who (b) willfully and knowingly (c) committed and conspired to commit two or more acts of mail and wire fraud (d) through a "pattern" of racketeering activity that (e) involves an "association in fact" enterprise, (f) the results of which had an effect on interstate commerce.

**A.    Defendants Are Culpable "Persons" Under RICO**

476.    Defendants, separately, are "persons" as that term is defined in 18 U.S.C. §1961(3) because each is capable of holding a legal or beneficial interest in property.

477.    Each one of Defendants are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

- 113 -

B.        **The Manufacturer-PBM RICO Enterprises**

478.    For the purposes of this claim, the RICO enterprise is an association-in-fact consisting of the PBM Defendants and the Manufacturer Defendants, including those entities' directors, employees, and agents.

479.    That association-in-fact enterprise is referred to herein as the "Manufacturer-PBM Enterprise."

480.    The Manufacturer-PBM Enterprise is a separate, ongoing, and continuing business organization consisting of corporations and individuals associated for the common purpose of manufacturing, selling, and facilitating the purchase of the Manufacturer Defendants' products, including the at-issue drugs.

481.    The Manufacturer-PBM Enterprise engaged in the shared purpose of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to control the market for diabetes medications and profit off diabetics and payors, including Plaintiff.

482.    The members of the Manufacturer-PBM Enterprise are bound by contractual relationships, financial ties, and the ongoing coordination of activities.

483.    There also is a common communication network by which Defendants share information and meet on a regular basis.  These communications include, but are not limited to, communications relating to the use of false list prices for the at-issue diabetes medications and the regular flow of Manufacturer Payments from each Manufacturer Defendant to the PBM Defendants in exchange for formulary placement.

484.    The Manufacturer-PBM Enterprise functions as a continuing but separate unit; separate and apart from the pattern of racketeering activity in which it engages.  Each Defendant,

for example, engages in the manufacture, distribution, and sale of medications and other products other than the at-issue insulin and insulin-analog medications. Additionally, each Manufacturer engages in conduct other than mail and wire fraud in furtherance of the Illegal Pricing Scheme.

485. At all relevant times, the Manufacturer-PBM Enterprise was operated and conducted for unlawful purposes by the Manufacturer Defendants and the PBM Defendants carrying out the Illegal Pricing Scheme.

486. The Manufacturer-PBM Enterprise derived secret profits from these activities that were greater than those any one of the Manufacturer Defendants or the PBM Defendants could obtain absent their misrepresentations regarding their non-transparent pricing schemes.

487. To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to the PBM Defendants in the form of Manufacturer Payments.

488. The Manufacturer-PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the false list prices.

489. The Manufacturer-PBM Enterprise's inflation of the list prices and secret Manufacturer Payments was a quid pro quo exchange for preferred formulary placement.

490. The Manufacturer-PBM Enterprise concealed from Plaintiff that these false prices and secret Manufacturer Payments resulted in each Manufacturer gaining formulary access without requiring significant price reductions and resulted in higher profits for Express Scripts and OptumRx, whose earnings increase the more inflated the price is and the more payment it receives from each Manufacturer Defendant.

491.    The Manufacturer-PBM Enterprise also shares a common purpose of perpetuating the use of the false list prices for the at-issue drugs as the basis for the price that payors, including Plaintiff, and diabetics pay for diabetes medications.

492.    The Manufacturer Defendants would not be able to offer large pricing spreads to the PBM Defendants in exchange for favorable formulary positions without the use of the false list prices as the basis for the price paid by diabetics and payors, including Plaintiff, for the at-issue drugs.

493.    The PBM Defendants share this common purpose because nearly all the revenue and profit generated from the at-issue drugs is tied to the false inflated prices generated by the Illegal Pricing Scheme.  Without diabetics and payors, including Plaintiff, paying for diabetes medications based on the inflated list prices, their profits from the Illegal Pricing Scheme would decrease.

494.    As a result, the PBM Defendants have, with the knowing and willful participation and assistance of each Manufacturer Defendant, engaged in hidden profit-making schemes falling into four general categories: (a) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant that the PBM Defendants retain to a large extent; (b) generating substantial profits from pharmacies because of the falsely inflated prices; (c) generating profits on the diabetes medications sold through Defendants' own mail-order and retail pharmacies; and (d) keeping secret discounts each Manufacturer Defendant provides in association with the PBM Defendants' mail-order and retail operations.

495.    At all relevant times, each PBM Defendant and each Manufacturer Defendant has been aware of their respective Manufacturer-PBM Enterprise's conduct, has been a knowing and willing participant in and coordinator of that conduct and has reaped profits from that conduct.

496.     Neither the PBM Defendants, nor any of the Manufacturer Defendants alone could have accomplished the purposes of the Manufacturer-PBM Enterprises without the other entities.

**C.     The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the Illegal Pricing Scheme**

497.     The Manufacturer-PBM Enterprise knowingly made material misrepresentations to the public and Plaintiff in furtherance of the Illegal Pricing Scheme, including publishing artificially inflated prices for insulin on published indices and representing that:

(a)     the false list prices for the at-issue diabetes medications were reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price Plaintiff paid for these drugs;

(b)     each Manufacturer priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation;

(c)     the Manufacturer Payments paid back to Express Scripts and OptumRx for each at-issue drug were for the benefit of third-party payors like Plaintiff;

(d)     all "rebates" and discounts negotiated by the PBM Defendants with the Manufacturer Defendants were remitted to third-party payors like Plaintiff;

(e)     the "rebates" negotiated by the members of each enterprise saved third-party payors like Plaintiff money;

(f)     each Manufacturer Defendant and the PBM Defendants were transparent with third-party payors Plaintiff regarding the Manufacturer Payments and the PBMs did not retain any funds associated with prescription drug rebates or the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies; and

(g)     the PBM Defendants constructed formularies in a manner that lowered the price of the at-issue drugs and promoted the health and safety of diabetics.

498.    Each false list price published by the Manufacturer Defendants constituted a material misrepresentation to Plaintiff and the public, in that each purported to be a fair market price for an at-issue drug, and each omitted to disclose the fraudulent spread between the list price and the net price of the medication or the basis therefor.

499.    At all times relevant to this Complaint, the Manufacturer-PBM Enterprise knew the above-described representations to be false.

500.    At all times relevant to this Complaint, the Manufacturer-PBM Enterprise intentionally made these representations for the purpose of inducing third-party payors like Plaintiff into paying artificially inflated prices for diabetes medications.

501.    Plaintiff relied on the material misrepresentations and omissions made by the Manufacturer-PBM Enterprise in paying prices for the at-issue diabetes medications based upon the false prices generated by Illegal Pricing Scheme.

502.    Express Scripts and OptumRx convinced Plaintiff to pay prices for the at-issue drugs based on the false list price by utilizing the misrepresentations listed above to convince Plaintiff that they had secured lower prices when, in fact, they did the opposite, all while concealing the Illegal Pricing Scheme. Although not relied upon by Plaintiff, CVS Caremark's participation in the Illegal Pricing Scheme was also a necessary component to the success of the scheme.

503.    Without these misrepresentations and each RICO Defendant's failure to disclose the Illegal Pricing Scheme, the Manufacturer-PBM Enterprise could not have achieved its common purpose, as third-party payors like Plaintiff would not have been willing to pay these false list prices.

1.      **Defendants' Use of the United States Mails and Interstate Wire Facilities**

504.    The Manufacturer-PBM Enterprise engaged in and affected interstate commerce because each engaged in the following activities across state boundaries: the sale, purchase and/or administration of diabetes medications; the setting and publishing of the prices of these drugs; and/or the transmission of pricing information of diabetes medications; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission of diabetes medications through mail-order and retail pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of diabetes medications; and/or the negotiations and transmissions of contracts related to the pricing of and payment for diabetes medications.

505.    The Manufacturer-PBM Enterprise participated in the administration of diabetes medications to millions of individuals located throughout the United States, including in County of Macomb and elsewhere in this District.

506.    Each Manufacturer Defendant's and each PBM Defendant's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

507.    The nature and pervasiveness of the Illegal Pricing Scheme, which included each Manufacturer Defendant's and each PBM Defendant's corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other and with pharmacies, physicians, payors, and diabetics in County of Macomb and throughout Michigan.

508.     The Manufacturer-PBM Enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the Illegal Pricing Scheme involved thousands of communications including:

(a)     marketing materials about the published prices for diabetes medications, which each Manufacturer Defendant sent each PBM Defendant located across the country, in County of Macomb, and throughout Michigan;

(b)     written and oral representations of the false list prices of diabetes medications that each Manufacturer Defendant and each PBM Defendant made at least annually and, in many cases, several times during a single year to the public;

(c)     thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer Defendant's diabetes medications on the PBM Defendants' formularies;

(d)     written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each PBM Defendant for each diabetes medication sold and/or to conceal these incentives or the Illegal Pricing Scheme;

(e)     written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to each PBM Defendant to persuade them to advocate the at-issue diabetes medications;

(f)     written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices or to forestall changes to reimbursement based on something other than published prices;

(g)     written and oral communications with payors, including Plaintiff, regarding the price of diabetes medications;

(h)     written and oral communications to third-party payors like Plaintiff, including marketing and solicitation material sent by the PBM Defendants regarding the existence, amount, or purpose of payments made by each Manufacturer Defendant to the PBM Defendants for the diabetes medications described herein and the purpose of the PBM Defendants' formularies;

(i)     transmission of published prices to third parties and payors, including Plaintiff; and

(j)     receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Illegal Pricing Scheme.

509.    Although Plaintiff pleads the dates of certain communications in allegations incorporated into this Count, it cannot allege the precise dates of others without access to books and records within each RICO Defendant's exclusive custody and control.  Indeed, an essential part of the successful operation of the Illegal Pricing Scheme depended upon secrecy, and each Manufacturer Defendant and each PBM Defendant took deliberate steps to conceal its wrongdoing.

### D.     Conduct of the Manufacturer-PBM Enterprises' Affairs

510.    Each Manufacturer Defendant and each PBM Defendant participates in the operation and management of the Manufacturer-PBM Enterprise with which it is associated and, in violation of Section 1962(c) of RICO, conducts or participates in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly.  Such participation is carried out in the following ways:

(a)      Each Manufacturer Defendant directly controls the secret Manufacturer Payments it provides to the PBM Defendants for its diabetes medications.

(b)      The PBM Defendants directly manage and control their respective drug formularies and the placement of the at-issue diabetes medications on those formularies.

(c)      The PBM Defendants intentionally select higher-priced diabetes medications for formulary placement and exclude lower priced ones in order to generate larger profits and they coordinate with the Manufacturer Defendants to increase the availability and use of higher-priced medications because they are more profitable for both groups of Defendants.

(d)      Each Manufacturer Defendant directly controls the publication of the false list prices generated by the Illegal Pricing Scheme.

(e)      Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales, and other materials used to inform the PBM Defendants of the profit potential from its diabetes medications.

(f)      The PBM Defendants directly control the creation and distribution of marketing, sales, and other materials used to inform payors and the public of the benefits and cost-saving potential of the PBM Defendants' formularies and negotiations with the Manufacturers.

(g)      The PBM Defendants direct and control each enterprise's direct relationships with payors such as Plaintiff by negotiating the terms of and executing the contracts that govern those relationships.

(h)      The PBM Defendants direct and control each enterprise's Illegal Pricing Scheme by hiding, obfuscating, and laundering Manufacturer Payments through their affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

- 122 -

(i)      The PBM Defendants distribute through the U.S. mail and interstate wire facilities, promotional and other materials that claim the Manufacturer Payments paid from each Manufacturer Defendant to the PBM Defendants save third-party payors such as Plaintiff money on the at-issue drugs.

(j)      Each Manufacturer Defendant represented to Plaintiff – by publishing and promoting false list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and PBM Defendants – that the published prices of diabetes medications reflected or approximated the actual price realized by Defendants and resulted from transparent and competitive, fair market forces.

### E.      Defendants' Pattern of Racketeering Activity

511.      Each Manufacturer Defendant and each PBM Defendant has conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. §1341, relating to mail fraud, and 18 U.S.C. §1343, relating to wire fraud.

512.      Each Manufacturer Defendant's and each PBM Defendant's pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Illegal Pricing Scheme.  Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. §1961(1).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. §1961(5), in which each Manufacturer Defendant and each PBM Defendant intended to defraud third-party payors like Plaintiff.

513.      By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments made from each Manufacturer Defendant to the PBM

Defendants' formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and each PBM Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

514.    Each Manufacturer Defendant's and each PBM Defendant's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

515.    Each separate use of the U.S. mails and/or interstate wire facilities employed by each Manufacturer Defendant and each PBM Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

516.    Each Manufacturer Defendant and each PBM Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Manufacturer-PBM Enterprise with which each of them is and was associated in fact.

### F.    The RICO Defendants' Motive

517.    Each Manufacturer Defendant's and each PBM Defendant's motive in creating and operating the Illegal Pricing Scheme and conducting the affairs of the Manufacturer-PBM Enterprise described herein was to control the market for diabetes medications and falsely obtain sales of and profits from diabetes medications.

518.    The Illegal Pricing Scheme was designed to, and did, encourage others, including payors such as Plaintiff, to advocate the use of each Manufacturer Defendant's products and to pay for those diabetes medications based on a falsely inflated price.  Each Manufacturer Defendant used the Illegal Pricing Scheme to obtain formulary placement to sell more of its drugs without having to cut into its profits.  The PBM Defendants used the Illegal Pricing Scheme to falsely

inflate the price payors such as Plaintiff paid for diabetes medications in order to profit off the Illegal Pricing Scheme, as discussed above.

### G.   The Manufacturer-PBM Enterprises' Illegal Pricing Scheme Injured Plaintiff

519.   The Manufacturer-PBM Enterprise's violations of federal law and pattern of racketeering activity have directly and proximately caused Plaintiff to be injured in its business or property.

520.   The prices Plaintiff pays for the at-issue drugs are tied directly to the false list prices generated by the Illegal Pricing Scheme and the corresponding inflation of rebates and other payments to the PBMs that are associated with those false list prices

521.   No other intermediary in the supply chain has control over or is responsible for the list prices on which nearly all Plaintiff's payments are based other than the Manufacturer-PBM Enterprise.

522.   Defendants collectively set the prices that Plaintiff paid for the at-issue diabetes medications.

523.   During the relevant period, Express Scripts and OptumRx provided PBM services to Plaintiff and benefitted therefrom.

524.   During the relevant period, Plaintiff paid Express Scripts and OptumRx for the at-issue drugs.

525.   The Manufacturer-PBM Enterprise controlled and participated in the Illegal Pricing Scheme that was directly responsible for the false list prices upon which the price Plaintiff paid was based.

526.     Thus, Plaintiff was damaged by reason of the Illegal Pricing Scheme.  But for the misrepresentations and false prices created by the Illegal Pricing Scheme that the Manufacturer-PBM Enterprise employed, Plaintiff would have paid less for diabetes medications.

527.     While Defendants' Illegal Pricing Scheme injured an enormous number of payors and plan members, Plaintiff's damages are separate and distinct from those of any other victim that was harmed by the Manufacturer-PBM Defendant Enterprise's Illegal Pricing Scheme.

528.     By virtue of these violations of 18 U.S.C. §1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to Plaintiff for three times the damages that were sustained, plus the costs of bringing this action, including reasonable attorneys' fees.

529.     By virtue of these violations of 18 U.S.C. §1962(c), under the provisions of Section 1964(a) of RICO, Plaintiff seeks injunctive relief against each Manufacturer Defendant and each PBM Defendant for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorneys' fees.

530.     Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue.  Plaintiff continues to purchase the at-issue diabetes medications.  Plaintiff will continue to pay based on Defendants' false list prices.  This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy.  Plaintiff seeks injunctive relief, including an injunction against each Manufacturer Defendant and each PBM Defendant, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Illegal Pricing Scheme.

## COUNT II

### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(d), by Conspiring to Violate 18 U.S.C. §1962(c)

531.   Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

532.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

533.   Defendants have violated Section 1962(d) by agreeing and conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in the Illegal Pricing Scheme.

534.   As set forth in detail above, Defendants each knowingly agreed to facilitate the Illegal Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.  Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants and the PBMs' formulary construction; and PBMs agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for formulary placement.

535.   The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18 U.S.C. §1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

- 127 -

536.    Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

(a)    multiple instances of mail fraud in violations of 18 U.S.C. §1341;

(b)    multiple instances of wire fraud in violations of 18 U.S.C. §1343; and

(c)    multiple instances of unlawful activity in violation of 18 U.S.C. §1952.

537.    Defendants' conspiracy to violate the above federal laws and the effects thereof detailed above are continuing and will continue.  Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C. §1962(c).

538.    By virtue of these violations of 18 U.S.C. §1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages that were sustained, plus the cost of this action, including reasonable attorneys' fees.

## COUNT III

### Contract, Combination, and Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1

539.    Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

540.    The Manufacturer Defendants and the PBM Defendants entered into an Illegal Pricing Scheme that took advantage of the disconnect between the end-users of prescription drugs and the end-payors of prescription drugs to manipulate the price of analog insulin throughout the payment chain of distribution so that all parties involved earn supracompetitive profits at the expense of end-payors such as Plaintiff.

541.    The relevant product market for purposes of this complaint are all analog insulin products. The relevant geographic market is the United States.

542.   As is set forth above, the Manufacturer Defendants collectively produce approximately 99% by dollar value of the analog insulin consumed in the United States.

543.   As is set forth above, the PBM Defendants collectively control approximately 89% of the PBM business in the United States.

544.   There are high barriers to entry into the business of manufacturing analog insulin in the United States because a potential new manufacture must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

545.   The market for analog insulins is somewhat unique among prescription drugs in that virtually all of the products on the market are brand-name products, rather than generic products which sell at a far lower price than brand-name drugs.  This is due, in part, to the fact that the Manufacturer Defendants' analog insulin products were originally approved as "drugs," which are a combination of chemicals, but in 2010, they fell within the FDA's newly defined category of "biologics," which are products that treat physical issues but are manufactured from living cells rather than from chemicals.

546.   The FDA regulations establishing "biologics" included a process for making generic equivalents for biologic drugs, called "biosimilars."  However, since the Manufacturer Defendants' analog insulin products were approved as "drugs" rather than as "biologics", a would-be manufacturer of a generic "biosimilar" insulin product could not take advantage of that process until 2020, when the FDA made the "biosimilar" process available for insulin products.

547.   Prior to 2020, the only entities which could sell generic insulins that were biosimilar to the Manufacturer Defendants' brand-name products were the Manufacturer Defendants themselves, who could have sold "authorized generics" of their own products based upon the prior

approval of those products by the FDA.  However, there was a financial disincentive for the Manufacturer Defendants to offer authorized generics for sale at lower prices because doing so would cannibalize the market for their brand-name products which would sell for higher prices.

548.    The PBM business also has high barriers to entry.  Among the reasons that end-payors such as Plaintiff hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors.  As a result a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

549.    The market for analog insulin is relatively inelastic with respect to demand.  For most diabetics, taking insulin is not an economic choice.  They must take their prescribed insulin or face serious health problems, including death.

550.    In addition, there is no incentive for a diabetic to use more insulin if the price were to drop because doing so would cause other health problems.

551.    In addition, diabetics whose insulin are paid for by a health plan, including Medicare or Medicaid, which makes up 98% of insulin users,[102] are insensitive to price increases because their out-of-pocket cost is limited to the fixed co-pay provided by their respective health plan, while the health plan itself, such as Plaintiff's, bears the brunt of any price increases announced by the Manufacturer Defendants.

552.    The Manufacturer Defendants and the PBM Defendants all understood that it was to their individual and collective advantage to maintain high list prices for analog insulin because

---

[102] *A cap on insulin costs benefits millions of Americans with diabetes*, USA Facts (Apr. 15, 2023), https://usafacts.org/articles/a-cap-on-insulin-costs-benefits-millions-of-americans-with-diabetes/.

doing so would allow all of them to generate higher revenue and profits than if they competed on price.

553.    As is explained above, for years prior to 2023, the Manufacturer Defendants announced list prices for analog in lock-step with each other, *i.e.*, when one Manufacturer Defendant would announce an increase in its list price, the other Manufacturers would raise their own list prices by a like amount within days of the announcement of the first price increase.

554.    In theory, it was the PBMs role to negotiate lower prescription drug prices on behalf of end-payors.  In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the Byzantine system for payment of prescription drugs to collect excessive, supracompetitive profits.

555.    Rather than negotiating with the Manufacturer Defendants to lower their list prices for analog insulin, the PBM Defendants at first did nothing because the higher list prices charged by the Manufacturer Defendants raised the PBMs' administrative fees.  However, when they came under increasing pressure from end-payors to do something to control ever-increasing insulin prices, rather than negotiate lower list prices, the PBM Defendants chose to negotiate rebates from the Manufactures of the revenue earned by their ever-increasing list prices in return for favorable placement on end-payor formularies.  By doing so, the PBM Defendants increased their own revenues at the expense of the end-payors.

556.    As the pricing system is set up in the United States, prescription drug manufacturers set the list price or WAC, which is the starting point for all pricing thereafter.  The WAC is the price that manufacturers charge to wholesalers.  Wholesalers, in turn, charge retailers based upon their AWP, which is generally the WAC plus 10%, subject to volume and other discounts available for other goods generally in the economy.

557.     At this point in the payment chain, the PBMs get paid an administrative fee, which is a percentage based upon the WAC and/or AWP, for handling the paperwork and other arrangements for the sales in the chain of distribution for the prescription drugs themselves.  Thus, the higher the manufacturers' WAC, the higher the PBMs' administrative fee at this point in the chain of payment since the administrative fee would be the same percentage of a bigger number.

558.     Also in the chain of payment, the PBMs are charged with negotiating the prices end-payors pay for prescription drugs used by their suppliers.  They do so by negotiating rebates rather than price cuts from the drug manufacturers.  These rebates are paid by the manufacturers to the PBMs.

559.     Upon information and belief, PBMs are compensated at this point in the chain of payment based upon the size of the rebate they are able to negotiate with the drug manufacturer.  Thus, in addition to getting a higher administrative fee with a higher WAC, if the PBMs are able to negotiate the same net price for the drug to be paid by end-payors, the PBMs compensation would be greater because they would be negotiating a larger rebate from a larger WAC.

560.     As the PBMs consolidated during the mid-2010s, the were able to negotiate larger rebates for themselves because they were in a position to threaten the Manufacturer Defendants with being excluded from the formulary for the particular group of end-payors the PBM was negotiating on behalf of.

561.     A formulary is the set of prescription drugs an end-payor will pay for on their particular prescription plan.  A drug's placement on the formulary will determine how much the plan beneficiary using the drug will pay as a co-pay.

562.     A more favorable placement means the plan beneficiary would pay a lower co-pay, which, in turn, would make it more likely for the plan beneficiary to use the lower-co-pay drug, if

the beneficiary has a choice.  On the other hand, if the drug is not on the formulary at all, the drug would not be covered by the health plan and the plan beneficiary would have to pay full retail price.  In the case of analog insulin, this could be the difference between a $35 copay and a retail price of well over $300.

563.    In some cases, the Manufacturer Defendants would negotiate rebates for favorable placement on the respective formulary, while in other cases, the Manufacturer Defendants might also attempt to negotiate exclusive placement for their insulin products on a particular formulary. Exclusive placement would cost a greater rebate, but would exclude the other Manufacturer Defendants' products from that particular formulary.

564.    The PBM Defendants' negotiations of rebates from the Manufacturer Defendant was obscure in the sense that the Manufacturer Defendants knew that they were negotiating with a particular PBM for placement of their respective insulin products, but only the PBM would know what the respective rebate bids would be and for what kind of placement on the formulary being negotiated.

565.    An additional feature that was often negotiated during this time period was what was called "price protection."  When price protection was included in the contract between the PBM and Manufacturer, if the Manufacturer raised its WAC more than a certain percentage, generally between 5% and 8% during the contract term, the Manufacturer would have to pay the PBM a higher rebate to make up for the higher WAC.

566.    However, the price protection did nothing to discourage raising prices and ultimately was to the PBMs advantage, not the advantage of end-payors, because if the Manufacturer raised the WAC, the PBM got a higher administrative fee and there was a larger rebate paid to the PBM.

567.   After the rebates have been negotiated for a particular formulary for a particular year, what happens with the rebates after they are paid to the PBMs is as obscure as the negotiation of the rebates themselves.  While it is generally believed that a portion of the rebates is passed along to the end-payor by the PBM, whether that actually happens and, if so, how much is passed along to the end-payor is a matter of conjecture because the contractual arrangements among PBMs, end-payors, and pharmacies are confidential.

568.   One fact that is clear is that the arrangements agreed to by the Manufacturer Defendants and the PBM Defendants in the vertical chain of payment to artificially manipulate prices resulted in supracompetitive prices paid by end-payors that are higher than what end-payors such as Plaintiff would have paid in a competitive market. Each such negotiated price and payment relationship between a Manufacturer Defendant and a PBM Defendant is an illegal restraint of trade.

569.   To the extent that each such restraint of trade is claimed by Defendants to provide procompetitive benefits, such claimed benefits are manifestly outweighed by the restraint's anticompetitive detriments as fully set forth in this Complaint.

570.   As a result of the foregoing, Plaintiff has been damaged in an amount equal to the difference between what it paid for the Manufacturer Defendants' analog insulin products and what it would have paid in a competitive market.

### COUNT IV

### Violations of the Michigan Antitrust Reform Act,
### Mich. Comp. Laws §445.772

571.   Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

572.    Section 2 of the Michigan Antitrust Reform Act, Mich. Comp. Laws §445.772, provides that "[a] contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful."

573.    For all of the reasons set forth in the preceding paragraphs, Defendants have violated the Michigan Antitrust Reform Act.

574.    As a result of the foregoing, Plaintiff has been injured in its business and/or property and is entitled to damages and injunctive relief to restrain Defendants from further violations of the Michigan Antitrust Reform Act.

## COUNT V

### Violation of the Michigan Consumer Protection Act,<br>Mich. Comp. Laws §445.901, *et seq.*

575.    Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

576.    Insulin is a product that is circulated in "trade or commerce" as defined in Mich. Comp. Laws 445.902(g) because, by its very nature, it is purchased for personal purposes.

577.    Plaintiff is a "person" under the Michigan Consumer Protection Act, Mich. Comp. Laws 445.902(1)(d), in that it is a "legal entity."

578.    The Manufacturer Defendants have engaged in unfair, unconscionable, or deceptive methods, acts, and practices in the conduct of trade or commerce in that they have

**A.** **"made false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" in violation of Mich. Comp. Laws 445.903(1)(i); and**

**B.** **"charg[ed] the consumer a price that is grossly in excess of the price at which similar property or services are sold" in violation of Mich. Comp. Laws 445.903(1)(z).**

579.    In 2018, the Manufacturer Defendants charged an average of $98.70 for their insulin products in the United States, while the same products were sold for the equivalent of $14.40 in Japan, $12.00 in Canada, $11.00 in Germany, $9.08 in France, $7.52 in the United Kingdom and less than $7.00 in Australia.

580.    Throughout the time period covered by this Complaint, there was a similar price discrepancy between the prices at which the Manufacturer Defendants sold analog insulin in the United States and what they charged elsewhere.

581.    For purposes of the transactions that are the subject of this Complaint, both County of Macomb and its insulin-using Beneficiaries were damaged by the unlawful pricing behavior in that both paid excessive amounts for the supracompetitively priced insulin products.

582.    As a result of the foregoing, Plaintiff has suffered an actual loss equal to the difference between the amount it paid for the Manufacturer Defendants' products and what it would have paid had the products been sold at legitimate prices without the Illegal Pricing Scheme.

## COUNT VI

### Unjust Enrichment

583.    Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

584.    This claim is alleged in the alternative to Plaintiff's claims for legal relief.

585.    It is a fundamental principle of fairness and justice that a person should not be unjustly enriched at the expense of another.

586.     A person should not be unjustly enriched at the expense of another even if that person's conduct is not tortious.

587.     Defendants jointly and severally deceived Plaintiff and have received a financial windfall from the Illegal Pricing Scheme at Plaintiff's expense.

588.     Plaintiff unknowingly conferred this benefit upon Defendants to Plaintiff's financial detriment.

589.     Defendants, jointly and severally, wrongfully secured and retained a benefit in the form of amounts paid for diabetes medications, unearned fees, and other payments collected based on the market forces and prices generated by the Illegal Pricing Scheme, and revenues that would not have been realized but for the Illegal Pricing Scheme.

590.     Defendants, jointly and severally, wrongfully secured and retained a benefit in the form of revenues and profits to which they were not entitled, which did not represent the fair market value of the goods or services they offered, and which were obtained at Plaintiff's expense.

591.     Defendants, jointly and severally, wrongfully secured and retained a benefit in the form of drug monies paid at prices that would not have existed but for Defendants' misconduct.

592.     Defendants were aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which they were not entitled, all at Plaintiff's expense.

593.     Any Defendants' retention of any portion of any benefit obtained by way of the Illegal Pricing Scheme is unjust and inequitable regardless of the Illegal Pricing Scheme's legality.

594.     Each and every Defendants' retention of any portion of the benefit violates the fundamental principles of justice, equity, and good conscience. Even absent Plaintiff's ability to prove the elements of any other claim, it would be unfair, unjust, and inequitable for any Defendant to retain any portion of the benefit.

595.     Even absent legal wrongdoing by any or all Defendants, Plaintiff has a better claim to the benefit than any and all Defendants.

596.     The benefit retained is in an amount not less than the difference between the reasonable or fair market value of the at-issue drugs for which Plaintiff paid and the actual value of the at-issue drugs these Defendants delivered.

597.     Defendants should not be permitted to retain the benefit conferred upon them by Plaintiff and restitution is appropriate to prevent the unjust enrichment.

598.     Accordingly, Plaintiff seeks disgorgement of the benefit and seeks restitution, rescission, or such other relief as will restore to Plaintiff that to which it is entitled.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment against Defendants for all the relief requested herein and to which Plaintiff may otherwise be entitled,

A.     That this Court determine that Defendants have violated RICO, have violated federal and Michigan antitrust laws, and have been unjustly enriched;

B.     Judgment in favor of Plaintiff and against Defendants for damages in excess of the minimum jurisdictional requirements of this Court, in a specific amount to be proven at trial;

C.     Injunctive relief to the effect that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein in violation of the federal and Michigan law, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect,

and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

D.      That Plaintiff:

     i.       be awarded restitution, damages, disgorgement, penalties, and all other legal and equitable relief to which Plaintiff may be entitled;

    ii.      be awarded punitive damages because Defendants knowingly, willfully, wantonly, and intentionally harmed the health, well-being, and financial interests of Plaintiff and its Beneficiaries;

   iii.      be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

   iv.      recover its costs of this action, including its reasonable attorneys' fees; and

    v.      be awarded such other further relief as the case may require and this Court may deem just and proper under the circumstances.

## VIII.  JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

DATED:  February 7, 2024

Paul F. Novak
Gregory Stamatopoulos
**WEITZ & LUXENBERG PC**
3011 W Grand Blvd, 24th Floor
Detroit, MI 48202
Telephone: (313) 800-4170
pnovak@weitzlux.com
gstamatopoulos@weitzlux.com


*/s/ Paul F. Novak*
PAUL F. NOVAK

Ellen Relkin
**WEITZ & LUXENBERG PC**
220 Lake Dr E #210
Cherry Hill, NJ 08002
Telephone: (856) 755-1115
erelkin@weitzlux.com

Mark Bernstein
Matthew Aneese
**THE SAM BERNSTEIN LAW FIRM PLLC**
31731 Northwestern Hwy, Suite 333
Farmington Hills, MI 48334
Telephone: (888) 225-5726
mbernstein@sambernstein.com
maneese@sambernstein.com

Attorneys for Plaintiff